UNITED STATES of America,
Plaintiff–Appellee,

v.

David Lee RUSHER, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Sarah Jean Shoemaker RUSHER,
a/k/a Sarah Anne Rusher,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

James Joseph FLANNERY, a/k/a James
Joseph Fleming, a/k/a Richard J.
Mutschler, Defendant–Appellant.

Nos. 91–5375, 91–5379 and 91–5381.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1991.

Decided June 3, 1992.

Anthony Harrison, Sr., Harrison, North, Cooke & Landreth, Greensboro, N.C., J. Matthew Martin, Martin & Martin, P.A., Hillsborough, N.C., argued, for defendants-appellants.

Douglas Cannon, Asst. U.S. Atty., Greensboro, N.C., argued (Robert H. Edmunds, Jr., U.S. Atty., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, LUTTIG, Circuit Judge, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

## OPINION

ERVIN, Chief Judge:

A highway patrolman stopped, searched, and discovered drugs and firearms in a pickup truck driven by defendant James Joseph Flannery and occupied by defendants David Rusher ("David") and his wife Sarah Rusher ("Sarah"). Flannery and the Rushers were convicted in the Middle District of North Carolina of possession with the intent to distribute methamphetamine and psilocin. On appeal, defendants argue, among other things, that the district court erred in not suppressing the evidence seized from the truck. The defendants also appeal their sentences: all three argue that the mandatory minimum sentencing provisions of 21 U.S.C. § 841(b)(1)(B)(viii) were inapplicable because the mixture of methamphetamine they possessed did not exceed 100 grams; the Rushers argue that the court erred in enhancing their sentences under the Federal Sentencing Guidelines because guns were involved in the offense; and David contests the court's upward departure from his criminal history category. We affirm the defendants' convictions and sentences in all respects, except that we vacate David's sentence and remand his case for resentencing because the court failed to state the specific reasons for departing.

### I.

The facts in this case are basically uncontested. On Friday, April 13, 1990 at 6:00 P.M., North Carolina Highway Patrol Trooper Tim Cardwell stopped a pickup truck driven by Flannery and occupied by the Rushers. Trooper Cardwell had been a state trooper for four and a half years and was on traffic duty, working alone with his police dog. Cardwell had observed that the occupants of the truck, headed northbound on I-85 just inside Guilford County, did not appear to be wearing seat belts and that the truck did not have a proper license

plate. When Cardwell pulled out and started to catch up to the truck, he noticed that it had a handmade cardboard Arizona registration tag in the rear glass of the cab.

Cardwell stopped the truck using his blue light, walked up to the driver's door, and asked the driver, Flannery, for his license and the vehicle registration. Cardwell verified that none of the occupants were wearing seat belts. Flannery produced an Arizona driver's license in the name of an alias and an Arizona registration for the truck in the name of Francine Robinson. Cardwell then requested Flannery to step back into the patrol car. While in the patrol car, Cardwell asked Flannery general questions about the truck and their trip. Flannery answered that the truck belonged to a friend in Arizona; that he had borrowed it to deliver welding and construction supplies to friends he had been staying with in Rockwell, North Carolina, the Rushers; and that they were now headed to visit friends in Greensboro. Cardwell asked about the cardboard "license plate," and Flannery said that he had lost the real plate and replaced it with a homemade one.

Cardwell issued a ticket for driving without proper registration and gave Flannery a warning for not wearing seat belts. Cardwell gave Flannery back his driver's license and then told Flannery that he was "free to go." J.A. 124. Cardwell then asked Flannery whether there were "any weapons, illegal contraband, alcohol or anything of an illegal nature in the vehicle." J.A. 274. Flannery said that there was not. Cardwell said that he asked Flannery about illegal contraband because Flannery's construction supplies story did not strike Cardwell as "a normal reasonable story." J.A. 163–64. Cardwell asked permission to search the truck, and Flannery granted the permission orally and through signing a consent form allowing a search of the vehicle and any "luggage and all contents therein." J.A. 334. The written form advised Flannery that he had the right to refuse to sign the form, to refuse to consent to the search, and to withdraw his consent at any time.

After Flannery signed the consent to search form, Cardwell asked him to go to the front of the truck. Cardwell then asked the Rushers to leave the truck and told them that he intended to search it for anything illegal. As Sarah got out of the truck, Cardwell asked her if the purse was hers, to which she replied yes. Cardwell also asked her if he could search it, and she orally consented; he did not ask her to sign a written consent form.

When Cardwell searched the pocketbook, he found a crystal white rock substance weighing about a gram. Cardwell thought it was either crack cocaine or methamphetamine (it turned out to be the latter). Cardwell then walked back to his patrol car to call for assistance. Sarah joined him at his car and asked what he was doing. Cardwell asked her if the rock substance was hers and she admitted that it was, adding that she only had "a little dope in it," and that the other two passengers did not know about it. J.A. 130. Cardwell placed her under arrest, advised her of her *Miranda* rights, and placed her in the front seat of the patrol car.

Cardwell returned to the truck to begin the search. He explained to David that Sarah had been arrested, and then searched the truck cab, finding only drug paraphernalia. Cardwell then began to search the ten to twenty bags located in the bed of the truck, which had a tin cover. As he started to open one of the bags, David asked what Cardwell was doing and began cursing and yelling at Cardwell, asking "What the hell is going on?" J.A. 133. Cardwell then returned to his patrol car and called for assistance. Sarah overheard the conversation and yelled to her companions, "He's calling for help; do something." J.A. 138. Cardwell got the dog out of the car and stationed him by the rear of the truck for his protection.

When another officer arrived, Cardwell resumed his search. When he reached a silver briefcase, Sarah yelled from the car, "He's found it, run." J.A. 140. Cardwell opened the briefcase and found what appeared to be drugs. The dog indicated that there were drugs in the briefcase, and

Cardwell arrested the two men. Later analysis showed that the briefcase contained 141 grams of marijuana, 10.2 grams of psilocin (a hallucinogenic mushroom), 41.5 grams of methamphetamine (ice), over $10,000 in cash, and a handgun. A later search of the rest of the bags uncovered three more fully loaded handguns, a semi-automatic rifle and silencer, chemistry textbooks, a business receipt and social security card under Flannery's alias, Sarah's "Sprint" card, and a magazine addressed to her.

On June 25, 1990, a federal grand jury in Greensboro, North Carolina returned an indictment charging all three defendants with two counts of possession of controlled substances with the intent to distribute them, 21 U.S.C. § 841(a)(1) & (b)(1)(B) (methamphetamine) and 21 U.S.C. § 841(a)(1) & (b)(1)(C) (psilocin), and two counts of possession and use of firearms and a firearm equipped with silencer during a drug trafficking offense. 18 U.S.C. § 924(c)(1). On October 2, 1990, the district court heard evidence on the defendants' motions to suppress evidence from the search of the truck. The district court denied the motion and issued a subsequently written memorandum opinion on April 1, 1991. The defendants' trial began on October 9, 1990. At the conclusion of the government's evidence, the court dismissed two counts of each defendant's indictment, ruling that the evidence did not show that the guns were used in the drug trafficking offenses.[1] The defense presented no evidence. The jury returned guilty verdicts for all three defendants on the remaining two drug charges.

The court sentenced the defendants on December 19, 1990. Flannery and the Rushers challenged the application of the mandatory minimum sentencing provisions of 21 U.S.C. § 841(b)(1)(B)(viii), claiming that their mixture of methamphetamine did not exceed 100 grams. The defendants also contended that the two level enhancement for possessing guns that were involved in the offense should not apply. The court disagreed with both arguments and sentenced Flannery and Sarah to a minimum five year active term of imprisonment. In addition, the court sentenced David to a 105 month active term of imprisonment, departing upward from the Sentencing Guidelines on the ground that they did not take into account David's long criminal history. Defendants timely appealed their convictions and their sentences.

## II.

Flannery appeals the district court's denial of his motion to suppress evidence resulting from the search of the truck. The Rushers join in this argument, and also contend that even if Flannery properly consented to the search of the truck, the district court erred in admitting the evidence against them because they did not.[2] In addition, David argues that even if Sarah consented to the search of her pocketbook, the evidence from that search should be suppressed against him because he did not.

▪ We review legal conclusions involved in the district court's suppression determination *de novo* but review factual findings underlying the legal conclusions subject to the clearly erroneous standard. *See United States v. Ramapuram*, 632 F.2d 1149, 1155 (4th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

## A.

▪ The first issue that a court must address in examining a Fourth Amendment

---

1. The government did not appeal this ruling.

2. Sarah also makes the Fifth Amendment argument that because Cardwell failed to give her a Miranda warning, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), her admission that the drugs found in her pocketbook were hers should be inadmissible. This argument fails. In *Berkemer v. McCarty*, 468 U.S. 420, 439-40, 104 S.Ct. 3138, 3149-50, 82 L.Ed.2d 317 (1984), the Supreme Court held that the roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for purposes of Miranda doctrine, and thus a defendant's prearrest statements are admissible evidence against him. Thus, the district court properly admitted Sarah's prearrest statement claiming ownership of the drugs.

claim is whether the defendant in question had a reasonable expectation of privacy in the area searched or the item seized.[3] *See Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 140–50, 99 S.Ct. 421, 428–34, 58 L.Ed.2d 387 (1978). The defendant bears the burden of proving that he has a reasonable expectation of privacy. *Ramapuram*, 632 F.2d at 1154. If the defendant does have such an expectation, then the court must determine the reasonableness of the search and seizure.

■ Individuals have a reduced expectation of privacy in motor vehicles due to the high level of regulation to which they are subject. *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 2069–70, 85 L.Ed.2d 406 (1985). However, Flannery did have a reasonable expectation of privacy in the truck and its contents. Although Flannery was not the owner of the truck, he was its driver and there is no evidence in the record tending to show that he was illegitimately in possession of it. *See United States v. Garcia*, 897 F.2d 1413, 1418–19 (7th Cir.1990) (holding that where government failed to prove that vehicle driven by accused was stolen, accused possessed privacy rights under Fourth Amendment because it was presumed that accused had owner's permission to use vehicle). In addition, Flannery later claimed to own the drugs and firearms that were seized from the truck, and an ownership or possessory interest in seized goods, while not dispositive, is relevant to determining whether an accused has a reasonable expectation of

privacy. *See United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980).

■ The Rushers, unlike Flannery, cannot meet their burdens of showing a reasonable expectation of privacy in the truck or its contents.[4] The Supreme Court held in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), that passengers in a car driven by the owner at the time of its search did not have a legitimate expectation of privacy in the car such that they could raise a Fourth Amendment challenge to a search of the car's interior. *Id.* at 148–49, 99 S.Ct. at 432–33. The Court held that a passenger normally has no legitimate expectation of privacy in a car in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object.[5] In addition, the Court stated that a passenger's privacy rights are no greater in the trunk of a car than in its interior. *Id.* We see no reason that the Court's statement regarding the trunk of a car would not apply to the covered bed of a pickup truck. Accordingly, a passenger normally has no reasonable expectation of privacy in the bed of a pickup. In the case at bar, the Rushers claim no ownership or possessory interest in the truck nor any interest in the drugs or firearms seized, and they have shown no special circumstance that would give them a greater expectation of privacy in the truck than passengers normally have. Therefore, they have no reasonable expectation of privacy to allow them to

---

3. The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

The Supreme Court has stated, "The warrantless search and seizure ... would violate the Fourth Amendment only if [defendants] manifested a subjective expectation of privacy ... that society accepts as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988).

4. Even though the Rushers cannot challenge the search of the truck, they can challenge their own seizures. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975) ("Fourth Amendment applies

to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest"); 4 Wayne R. LaFave, *Search and Seizure* § 11.3(e), at 324–25 (2d ed. 1987). This means that they have standing to argue that the initial stop of the truck and their ejections from it were pretextual and thus illegal, but these arguments fail on their merits, as stated in section II.B below.

5. Requiring that the accused assert a possessory interest in the seized object at a suppression hearing to protect his Fourth Amendment rights will not place him in an untenable situation, because that information cannot be used against him at trial. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

contest the search. *See United States v. Manbeck,* 744 F.2d 360, 374–75 (4th Cir. 1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *cf. United States v. Kye Soo Lee,* 898 F.2d 1034, 1037–38 (5th Cir.1990) (driver and passenger in rental truck found to have reasonable expectation of privacy in contents of truck's cargo hold because both were hired by renter of truck to transport the contents).

 Finally, David cannot demonstrate such an expectation in his wife's purse. Factors that courts consider in determining if a person has a reasonable expectation of privacy in property held by another include whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property. *See Rawlings v. Kentucky,* 448 U.S. 98, 105–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980). None of these factors weigh in favor of David's claim here. Therefore, David cannot challenge the evidence acquired from the search of Sarah's purse.

## B.

 Because of Flannery's and the Rushers' privacy interest in their persons and Flannery's privacy interest in the truck and its contents, we next determine whether the seizure of the truck and the consequent search were unreasonable. As the Supreme Court has held, "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). An ordinary traffic stop is, however, a limited seizure more like an investigative detention than a custodial arrest. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984). We therefore employ the Supreme Court's analysis for investigative detention used in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to determine the limits of police conduct in routine traffic stops. *See Berkemer,* 468 U.S. at 439, 104 S.Ct. at 3149. This approach presents us with a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879; *see also Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) ("The scope of the detention must be carefully tailored to its underlying justification."). If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the "fruit of the poisonous tree doctrine." *See, e.g., Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963); *United States v. Durant,* 730 F.2d 1180, 1182 (8th Cir.), *cert. denied,* 469 U.S. 843, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984); *cf. Boggs v. Bair,* 892 F.2d 1193, 1200 (4th Cir.1989) (holding that defendant's fruit of poisonous tree argument fails because search of car was lawful), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990).

 Flannery, properly joined by the Rushers, first argues that Trooper Cardwell lacked reasonable suspicion to stop the truck to investigate for drugs, and that his stated reasons, that the occupants were not wearing seat belts and that the truck had a homemade license tag, were pretextual, so the stop was not justified at its inception. *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. We must examine Cardwell's actions and motives using an objective standard. As the Supreme Court has stated:

Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," and not on the officer's actual state of mind at the time the challenged action was taken.

*Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); *accord Blair v. United States,*

665 F.2d 500, 506 (4th Cir.1981). Flannery suggests that we adopt the view, held by two other circuits, that an investigative stop is valid as not pretextual, not if an officer legally *could* have stopped the car in question because of a suspected traffic violation, but rather if "a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986); *accord United States v. Valdez*, 931 F.2d 1448, 1450–51 (11th Cir.1991) (applying *Smith* test); *United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir.1988) (adopting *Smith* test); 1 Wayne R. LaFave, *Search and Seizure* § 1.4(e), at 92–94 (2d ed. 1987). Other circuits hold, to the contrary, that an investigative stop is justified at its inception if the officer was legally entitled to make the stop; "so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir.1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *accord United States v. Cummins*, 920 F.2d 498, 500–01 (8th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Causey*, 834 F.2d 1179, 1184–85 (5th Cir.1987) (en banc).

Applying either test to the facts of this case would yield the same result, so we reserve the choice between the two for another day. The district court below explicitly applied the *Smith* test and found that "Cardwell's stopping the truck driven by defendant Flannery was not pretextual." Slip op. at 6. Flannery and the Rushers argue, however, that the court erred in applying the test. They point out that Cardwell had a drug detection dog with him when he stopped the truck, he immediately asked Flannery whether there were drugs in the truck, and it was Cardwell's practice often to ask if he could search vehicles that he had stopped, which he did 15% of the time. They argue further that because the truck was of 1974 vintage, and the government required shoulder straps·

only in 1976, Cardwell was mistaken in stopping them for failure to wear seat belts. It is highly unlikely, however, that a reasonable officer would have realized this two-year difference when he or she decided to stop the truck. In addition, the fact that the license plate was faulty is undisputed. We therefore hold that on the facts of this case the district court was not clearly erroneous in finding that a reasonable highway patrolman would have stopped the vehicle given that it had two apparent violations; thus, the traffic stop was not pretextual under the *Smith* test. Nor would the district court's disposition have differed had it applied the other approach, for in stopping the truck Cardwell was doing no more than he was objectively authorized and legally permitted to do. *See* N.C.Gen.Stat. § 20–118.3 (prohibiting operation by nonresident of vehicle on North Carolina highway without registration plate issued by resident jurisdiction); N.C.Gen.Stat. § 20–135.2A (requiring drivers of passenger vehicles to wear safety belts). Therefore, Cardwell's initial stop of the truck was constitutional under either approach.

### C.

Flannery next contends that even if the original stop was not pretextual, Cardwell's subsequent investigation exceeded the proper scope of the traffic stop.[6] We are in accord with the Tenth Circuit Court of Appeals in defining an officer's proper investigative scope for a routine traffic stop. The officer:

> may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988) (citations omitted). Any further detention for questioning is beyond the scope of the *Terry* stop and

---

**6.** The Rushers cannot join in this part of the argument. *See supra* text on p. 874 accompanying footnote 4.

therefore illegal unless the officer has a reasonable suspicion of a serious crime. *See Florida v. Royer*, 460 U.S. 491, 498–99, 103 S.Ct. 1319, 1324–25, 75 L.Ed.2d 229 (1983); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975).

We, however, need not reach the issue of whether Cardwell had a reasonable suspicion of unlawful activity sufficient to justify his questioning of Flannery about contraband and his request to search the truck. The Supreme Court in *Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), considered whether a "consensual encounter" existed when the defendant allowed two officers to search his luggage on a bus before it was to leave. According to the Court, the appropriate inquiry for the trial court is whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter. If so, the interaction was a consensual encounter that did not rise to the level of a Fourth Amendment seizure, and the officers were justified in questioning the defendant and asking consent to search his bags. —— U.S. at ——, 111 S.Ct. at 2389, 115 L.Ed.2d at 400. In the case at bar, the district court implicitly found that Cardwell ended his detention of Flannery and began a consensual encounter before questioning him about contraband and requesting permission to search the truck when he told Flannery that he was free to go. According to the court: "[Flannery] was free to leave and did not need to answer any of the trooper's questions." Slip op. at 7. This finding by the district court should not be disturbed unless clearly erroneous, and we decline to disturb it here.

Having determined that Cardwell was justified in asking for consent to search the truck and luggage, our next step is to determine whether Flannery's consent was freely given. If the search was consensual, that would end our Fourth Amendment inquiry. As the Supreme Court stated:

The Fourth Amendment does not proscribe all state-initiated searches and sei-

zures; it merely proscribes those which are unreasonable. Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.

*Florida v. Jimeno*, —— U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297, 302 (1991) (citations omitted). According to the Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), consent is an issue of fact, and a determination of whether a particular consent is truly voluntary is made by examining the totality of the circumstances surrounding the consent. The district court found that "[t]he information and consent gained through the trooper's conversation with Flannery were voluntarily given." Slip op. at 7. We uphold this determination since it is not clearly erroneous. *See United States v. Depew*, 932 F.2d 324, 327 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991). We therefore uphold the district court's denial of Flannery's motion to suppress.

### III.

The Rushers contest the district court's denial of their individual motions to sever their trials, alleging prejudice from the joint trial. Specifically, they argue that Flannery would have testified in their separate trials that the guns and drugs were his and not the Rushers' since he so stated to the probation officer in presentence investigation. According to the Rushers, the government would have no case against them if Flannery owned the contraband, except for the drugs in Sarah's personal possession.

Under Fed.R.Crim.P. 14, the court may grant a severance if it appears that a defendant is "prejudiced" by a joinder of offenses or of defendants. Barring "special circumstances," however, the general rule is that defendants indicted together should be tried together for the sake of judicial economy. *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir.1981). The district court's decision to grant or deny a motion for severance will be overturned

only for a clear abuse of discretion. *Person v. Miller*, 854 F.2d 656, 665 (4th Cir. 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989). "Such an abuse of discretion will be found only where the trial court's decision to deny a severance 'deprives the defendant[s] of a fair trial and results in a miscarriage of justice.'" *Id.* (quoting *United States v. Becker*, 585 F.2d 703, 706 (4th Cir.1978)).

In *United States v. Parodi*, 703 F.2d 768, 779–81 (4th Cir.1983), we set out what a defendant must show to receive a severance based on need for a co-defendant's testimony. In the case at bar, the Rushers must first show a "'reasonable probability ... that the proffered testimony would, in fact materialize' and that the 'co-defendant would have waived his Fifth Amendment' right at a separate trial." *Id.* at 779 (quoting *United States v. Shuford*, 454 F.2d 772, 778 (4th Cir.1971)). There is, however, no evidence that Flannery would have testified that the drugs were his at a separate trial. Severance is not required when the co-defendant would testify only if his case came first. *Id.* The fact that Flannery failed to testify during the joint trial and claimed the drugs only after conviction tends to show that for him to agree to testify at a separate trial of the Rushers, if he would even do so, he would have required that he be tried first, and there is nothing in the record to refute this argument.

Second, the exculpatory nature and effect of the testimony must be definite and establish that the Rushers would be unable to obtain a fair trial without severance, not merely that a separate trial would offer them a better chance of acquittal. *Id.* at 780. The Rushers failed to make this showing: Flannery's testimony was purely hypothetical and the Rushers entirely failed to demonstrate how they were denied a fair trial through being tried jointly. Therefore, we find no abuse of discretion in the district court's denial of the Rushers' motions to sever.

IV.

■ David contends that there is no evidence other than his presence in the truck and his cursing of the officer to link him to the drugs in the back of the truck, and therefore the district court erred in not granting his motion for verdict of acquittal. We must sustain a guilty verdict if there is substantial evidence, viewing the evidence in the light most favorable to the government, to support the finding of guilt. *United States v. Sherman*, 421 F.2d 198, 199 (4th Cir.), *cert. denied*, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970). The issue is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The offenses for which David was convicted, possession with the intent to distribute methamphetamine and psilocin, require the government to prove beyond a reasonable doubt that the defendant (1) knowingly (2) possessed the controlled substance (3) with the intent to distribute it. *See* 21 U.S.C. § 841(a)(1). Actual or sole possession of a controlled substance is not required; constructive possession is sufficient, which the government can prove by showing that the defendant exercised, or had the power to exercise, dominion and control over the item. *United States v. Laughman*, 618 F.2d 1067, 1076–77 (4th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). Mere presence on the premises where the drugs were found or association with the possessor, however, is insufficient to establish possession. Intent to distribute may be inferred from the quantity of drugs possessed. *United States v. Samad*, 754 F.2d 1091, 1096 (4th Cir.1984).

■ The evidence that the government presented against David is as follows: (1) All three defendants were riding together in the truck that contained the drugs and firearms; (2) David's wife had what a chemist testified to be part of the batch of methamphetamine found in the truck in her purse; (3) David began cursing Cardwell when he started searching the bed of the truck, which was where the firearms and drugs were located, and David did not be-

come upset, either about the search of the cab of the truck or about his wife's arrest for possession, until this time; (4) Sarah yelled for Flannery and David to run away when Cardwell began looking at the silver briefcase containing the drugs; (5) David's wife's "Sprint" card was in the briefcase and a magazine addressed to her was in another case in the back of the truck; (6) the truck contained more drugs than the three defendants could reasonably have been expected to use personally. Although far from overwhelming, the evidence is sufficient to support David's conviction as a matter of law.

## V.

 Flannery and the Rushers object to their receiving a mandatory minimum sentence of five years' imprisonment based on their possession of 72 grams of methamphetamine of between 86% and 91% purity. Congress enacted the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207 (1986), shortly before the sentencing guidelines went into effect. The Anti–Drug Abuse Act enhanced the penalties imposed by preexisting statutes for most federal drug offenses. According to the Act, a five year minimum sentence is applicable when the amount of drugs involved in the offense is:

> 10 grams or more of methamphetamine, its salts, isomers, and salts of its isomers *or* 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

21 U.S.C. § 841(b)(1)(B)(viii) (emphasis added).

Flannery's and the Rushers' argument that the district court erred is solely one of statutory construction, and we accordingly review the court's interpretation *de novo*. The defendants argue that "10 grams" refers to "pure" methamphetamine, and the "or" serves to distinguish between pure methamphetamine and a mixture containing methamphetamine, so pure methamphetamine is different from a mixture containing methamphetamine. Thus, because they possessed less than 100 grams of a

mixture containing the drug, not the drug in a pure state, they contend that they are not subject to the mandatory sentence. The government argues that whether the defendants possessed 10 grams or more of methamphetamine is determined by multiplying the amount of the drug times its purity, which here equals at least 61 grams of methamphetamine. According to the government, the clause referring to 100 grams of a mixture containing a detectable amount of methamphetamine applies only to situations where the amount times the purity would not total 10 grams of methamphetamine because of a low concentration of methamphetamine in the mixture.

We have not been called upon to interpret section 841(b)(1)(B)(viii) in the past. The First Circuit Court of Appeals recently considered the provision in *United States v. Stoner*, 927 F.2d 45 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 129, 116 L.Ed.2d 96 (1991). The *Stoner* court agreed with the government's position in the case at bar, holding that the defendant met the 10 grams of methamphetamine requirement by possessing 82.9 grams of methamphetamine of 32% to 38% purity. The court noted that, under the defendant's interpretation, a person with 99 grams of 99% pure methamphetamine would not receive the mandatory minimum sentence while another with merely 10 grams of pure methamphetamine, little more than one-tenth of the first amount, would. This anomalous result would give distributors the perverse incentive to cut the drug with a small amount of dilutant in order to avoid the mandatory sentence. *Id.* at 46. In addition, according to the *Stoner* court, the defendant's interpretation would create a difficult line-drawing problem for the courts. Drugs are virtually never pure, so some contamination would have to be accepted in the "pure" category, or that prong of the definition would never be used. It would be difficult for courts to determine how much contamination should be allowed, however, and there is no indication that Congress intended for courts to engage in this somewhat arbitrary line-drawing process. *Id.* at 47. Finally, the court pointed out that the defendant's in-

terpretation would make sense only if Congress determined that possession of pure methamphetamine is qualitatively different from possession of a mixture containing the drug. Congress explicitly did intend to distinguish pure "crack" cocaine from other forms of cocaine because of its extreme potency and addictiveness, and accordingly imposed enhanced sentences for "crack." Congress chose not to distinguish the pure form of methamphetamine from a mixture containing it, however. *Id.*

We are persuaded by the First Circuit's analysis. The sentencing guidelines, which follow the Anti–Drug Abuse Act in determining their penalties, *see* U.S.S.G. § 2D1.1, comment. (n. 10), offer further support for this conclusion. As the guidelines state, "In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance or the offense level determined by the weight of the pure PCP or methamphetamine, whichever is greater." *Id.* § 2D1.2(c), n. *. The only way to conduct this analysis is to multiply the purity of the drug times its quantity to obtain the amount of pure methamphetamine. *Cf. United States v. Brown*, 921 F.2d 785, 789–90 (8th Cir.1990) (interpreting guidelines to require multiplying purity of PCP mixture times its quantity to arrive at amount of pure PCP). We therefore affirm the district court's imposition of Flannery's and the Rushers' mandatory five year minimum sentences.

### VI.

Both Rushers contest the district court's sentence enhancements under section 2D1.1(b)(1) of the Federal Sentencing Guidelines applicable at the time of sentencing, which states that"[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense, increase by 2 levels." [7] The Rushers argue that Flannery owned the weapons, as he

stated to the probation officer during presentence investigation, and so they did not possess them.[8]

As we stated in *United States v. Daughtrey*, 874 F.2d 213, 218 (4th Cir. 1989), the standard of review of a guidelines determination is a "sliding scale". "If the issue turns primarily on a factual determination, an appellate court should apply the 'clearly erroneous' standard. If the issue, for example, turns primarily on the legal interpretation of a guideline term, ... the standard moves closer to *de novo* review." *Id.* at 217 (citation omitted). The question of whether the Rushers "possessed" a firearm during commission of their offense is close to a factual determination subject to the clearly erroneous standard. *See United States v. Durrive*, 902 F.2d 1221, 1231 (7th Cir.1990) (applying clearly erroneous standard); *United States v. Koonce*, 884 F.2d 349, 354 (8th Cir.1989) (same).

To interpret this section, we must consider the commentary to the guidelines. U.S.S.G. § 1B1.7 & comment. According to the commentary to section 2D1.1:

The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.

U.S.S.G. § 2D1.1, comment. (n.3). The question before us, then, is whether the district court erred in not finding it "clearly improbable" that the guns were connected to the offense. One of the firearms was located in the same briefcase that contained the drugs, and the others, fully loaded, were found in the bed of the same truck. Even if Flannery is correct that he owned the guns, the district court did not err in finding that the Rushers also "possessed" them for sentence enhancement

---

7. This section was amended on November 1, 1991 by deleting the phrase "during commission of the offense."

8. The court dismissed two counts for each defendant under 18 U.S.C. § 924(c)(1), which provides an additional sentence for one who "uses or carries a firearm" "during and in relation to any ... drug trafficking crime."

purposes. *See United States v. White*, 875 F.2d 427 (4th Cir.1989) (upholding district court's finding that defendant possessed gun under coperpetrator's seat, thus holding enhancement proper).

### VII.

Finally, David contends that the court's three-category upward departure in determining his criminal history classification violated the guidelines. Normally, only sentences of imprisonment greater than one year and one month that are less than fifteen years old and shorter sentences that are less than ten years old can be considered in determining a defendant's criminal history. U.S.S.G. § 4A1.2(e). Counting only these offenses, David's criminal history was category III. The district court, however, apparently looked at David's entire criminal life history to justify departing upward to category VI, the highest category. The sentences counted in the presentence report to place David initially in category III were (1) three 1974 crimes resulting in concurrent three-year sentences for possession of counterfeit paraphernalia, theft of government property, and interstate transportation of stolen property; and (2) two 1985 crimes resulting in five years' imprisonment for felony possession of firearms and possession of false identification documents. David's crimes older than fifteen years were:

| 1959 | age | 19 | worthless check/false pretenses | 6–12 mos. |
| 1960 | age | 20 | armed robbery | 8 yrs. |
| 1961 | age | 21 | attempted larceny/burglary tools | 1–5 yrs. |
| 1961 | age | 21 | concealed weapon | 3 mos. |
| 1961 | age | 21 | interstate transportation stolen car | 1 mo. |
| 1962 | age | 22 | larceny | 1–5 yrs. |
| 1973 | age | 33 | assault on federal officer | 76 days |

An upward departure in the criminal history category may be justified through sentencing guideline section 4A1.3, which allows courts to use "reliable information [that] indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past crimi-

nal conduct or the likelihood that the defendant will commit other crimes." This section of the guidelines (the "reliable information section") contains a provision that specifically allows the district court to consider "prior sentence(s) not used in computing the criminal history category" as reliable information warranting departure. U.S.S.G. § 4A1.3(a). The district court in this case did not specifically state the grounds upon which it departed. The court did incorporate David's presentence report, which recommended that the court depart from the criminal history category in terminology that parallels the reliable information section; thus, we will assume that this section provided the court's reason for departing.

### A.

A district court may depart from the guidelines only if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). In reviewing upward departures, we must first determine whether the sentence was imposed either in violation of law or as a result of an incorrect application of the guidelines. 18 U.S.C. § 3742(f)(1). If so, we must remand for resentencing. *See Williams v. United States*, — U.S. —, —, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992).

The Court in *Williams* specifically reserved answering the initial guidelines interpretation question presented here that we must consider *de novo*. *See* — U.S. at —, 112 S.Ct. at 1122. That question is whether the guidelines' explicit authorization for upward departures in the criminal history category using outdated sentences that provide evidence of "similar misconduct"[9] implicitly disallows using dissimilar

---

**9.** As stated in commentary to the guideline section that in general disallows consideration of sentences older than 10 or 15 years, depending on the length of sentence:

If the government is able to show that a sentence imposed outside this time period is evidence of *similar misconduct* or the defendant's receipt of a substantial portion of income from criminal livelihood, the court may

old convictions as "reliable information" to depart. *Compare* U.S.S.G. § 4A1.2, comment. (n. 8) *with* U.S.S.G. § 4A1.3. We agree with several other circuits that the guidelines should be read to allow old convictions to be used as reliable information to depart even if the convictions are not evidence of similar misconduct. *See United States v. Aymelek*, 926 F.2d 64, 72–73 (1st Cir.1991); *United States v. Russell*, 905 F.2d 1439, 1444 (10th Cir.1990). *But see United States v. Leake*, 908 F.2d 550, 553–54 (9th Cir.1990) (upward departure may not be based on dissimilar outdated convictions). We do agree with the First Circuit Court of Appeals in *Aymelek*, however, that outdated convictions may be used as reliable information to depart only if they "evince some significantly unusual penchant for serious criminality, sufficient to remove the offender from the mine-run of other offenders." 926 F.2d at 73.

▮▮▮▮ If the district court identifies one or more aggravating or mitigating circumstances "not adequately taken into consideration," it may depart from the sentencing range only if it further determines that a sentence different from the guidelines "should result." 18 U.S.C. § 3553(b). The court must determine whether the circumstance identified and found to exist in the particular case is of sufficient importance and magnitude to justify a departure. *United States v. Goff*, 907 F.2d 1441, 1445 (4th Cir.1990). In making this determination the district court is engaged in fact-finding, and we use a standard of review approximating the clearly erroneous standard. *United States v. Summers*, 893 F.2d 63, 67 (4th Cir.1990). However, as the Sixth Circuit Court of Appeals has stated, "our deference depends upon the district court's providing a reasoned statement of 'the specific reasons for its departure in language relating to the Guidelines....' " *United States v. Kennedy*, 893 F.2d 825, 827 (6th Cir.1990) (quoting *United States v. Rodriguez*, 882 F.2d 1059, 1066 (6th Cir. 1989)). Congress enacted the Sentencing Reform Act to remove the uncertainties

and disparities in sentencing that resulted from earlier systems, where judges had broad discretion in imposing sentences. *See Mistretta v. United States*, 488 U.S. 361, 366, 109 S.Ct. 647, 651, 102 L.Ed.2d 714 (1989); 28 U.S.C. § 991(b)(1)(B). To allow a judge summarily to depart from the guidelines without explaining why would be to return to sentencing practices rejected by Congress. Congress intended that the judge provide the most detailed explanation for a sentence beyond the boundary of the guideline range. *Compare* 18 U.S.C. § 3553(c)(1) (requiring expression of "the reason" for imposing a particular sentence within a guideline range of 24 or more months) *with* 18 U.S.C. § 3553(c)(2) (requiring expression of "the specific reason" for departing from the applicable range). *See United States v. Cervantes*, 878 F.2d 50, 54 (2d Cir.1989). Articulating the reasons for departing is also necessary to allow informed appellate review of the judge's decision to depart. *See* 18 U.S.C. § 3742.

Where a district court chooses to depart pursuant to section 4A1.3, it must therefore provide "a short clear written statement or a reasoned statement from the bench" to support its departure. *United States v. Perez*, 871 F.2d 45, 47 (6th Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989). The court is not required to "incant the specific language used in the guidelines, ... [but should] identify clearly the aggravating factors and its reasons for connecting them to the permissible grounds for departure under section 4A1.3." *United States v. De Luna–Trujillo*, 868 F.2d 122, 124 (5th Cir. 1989). We are simply unable to review the reasons for a district court's departure if it fails to present them with specificity in language relating to the guidelines.

▮▮▮ The court in this case failed to provide specific reasons for departing. The court stated at David's sentencing that "I just think we have a defendant who

consider this information in determining whether to depart and sentence above the applicable guideline range.

U.S.S.G. § 4A1.2, comment. (n. 8) (emphasis added).

needs substantial punishment and that his conduct warrants it." J.A. 544. The court then found that this conduct warranted an upward departure in the criminal history category:

THE COURT: Now, gentlemen, with reference to departing upwardly, the Court finds that there are sufficient criminal offenses in the record wherein no points were assessed, and by reason of such, the Court deems that there is adequate criminal activity in the record to deviate from the sentence in this case upward, and by reason of such the Court finds as a fact that there are sufficient offenses listed in the report wherein this defendant has been involved since the age of fifteen and he's now fifty-one, that the Court will depart upwardly and will determine the criminal history level to be— Just have a seat a minute, please. Mr. Johnson. Mr. Martin and Mr. Cannon, you may come up.

(Bench comment on the record.)

THE COURT: How far do I have to deviate upward, to what criminal offense level, to give him 120 months?

PROBATION OFFICER: First of all, I would recommend you find that a criminal history category of six would be more appropriate based on the reasons you just gave for justification.

THE COURT: And a criminal history of six. What offense level must I use?

PROBATION OFFICER: 11 to 26. However, I'm not certain that you have to increase the offense level. I think it's recommended that that not be done. If you just find the criminal history category of six more appropriately reflects his past criminal conduct.

THE COURT: Thank you very much.

MR. CANNON [Assistant United States Attorney]: Judge, that would make the range 84 to 105 months.

PROBATION OFFICER: Based on the current offense level of 22.

THE COURT: You say raise it to an offense level of six.

PROBATION OFFICER: Criminal history category of six.

THE COURT: And then that would be sufficient to impose 120 months sentence.

MR. CANNON: We can't get there.

PROBATION OFFICER: The maximum at offense level 22 would be 105 months.

THE COURT: And that's what I'm stuck with—105 months. All right. Thank you.

(End of bench conference.)

THE COURT: ... Mr. Rusher, the Court is going to deem that your criminal history is sufficient that a criminal history category of six would be more appropriate, and in view of that, the Court will commit you to the custody of the Bureau of Prisons for a term of 105 months.

J.A. 547–49.

The court essentially bypassed the criminal history categories entirely in its desire to impose a particular sentence. This cannot be done under the sentencing guidelines regime. Sentencing is not purely a matter of judicial discretion, but must be done by reference to the guidelines and their stated criminal history categories. In our opinion, the court's conclusory statements that David committed sufficient previous offenses to warrant an upward departure in his criminal history category do not allow us meaningfully to review the court's departure from the guidelines. *See* 18 U.S.C. § 3742. The requirement of providing specific reasons for departing "is not satisfied by a general recitation that the defendant's criminal history category or offense level underrepresents, in the sentencing court's opinion, the defendant's criminal record or the seriousness of the charged offense." *United States v. Wells*, 878 F.2d 1232, 1233 (9th Cir.1989) (per curiam). At the very least, the court should point to what aspects of David's criminal history it thinks the guidelines did not adequately consider in setting the criminal history category, and determine on the record whether these aspects are of sufficient importance and magnitude to justify departure. *See United States v. Goff*, 907 F.2d 1441, 1445 (4th Cir.1990).

B.

If, in reviewing a district court's upward departure, we conclude that the departure was not imposed either in violation of law or as a result of an incorrect application of the guidelines, we must determine whether the resulting sentence was an unreasonably high departure from the relevant guideline range. 18 U.S.C. § 3742(f)(2). If so, a remand is required. *See Williams,* — U.S. at —, 112 S.Ct. at 1120. Even though we conclude that the court's departure was indeed unlawful because of its failure to provide specific reasons for departing in language relating to the guidelines, we still consider the reasonableness of the departure in this case in order to provide guidance to the court should it decide to depart on remand from this court. The Supreme Court directs us to look to the amount and extent of the departure in light of the grounds for departing to determine whether the resulting sentence was unreasonable. *Id.* We must examine the factors to be considered in imposing the sentence under the guidelines, as well as the district court's stated reasons for imposing the sentence. *Id.;* 18 U.S.C. § 3742(e). We will accord significant deference to the sentencing judge's departure determination. *United States v. Terry,* 916 F.2d 157, 162 (4th Cir.1990).

■ Once the district court has decided to depart upward in the criminal history category, the majority of courts, in making their "reasonableness" inquiry, require the judge to refer first to the next higher category and allow the court to move on to a still higher category only upon a finding that the next higher category fails adequately to reflect the seriousness of the defendant's record.[10] *See United States v. Calderon,* 935 F.2d 9, 12 (1st Cir.1991); *United States v. Kennedy,* 893 F.2d 825, 828–29 (6th Cir.1990); *United States v. Richison,* 901 F.2d 778, 781 (9th Cir.1990); *United States v. Allen,* 898 F.2d 203, 204–05 (D.C.Cir.1990); *United States v. Jones,* 905 F.2d 867, 870 (5th Cir.1990);[11] *United States v. Coe,* 891 F.2d 405, 412–13 (2d Cir.1989); *United States v. Anderson,* 886 F.2d 215, 216 (8th Cir.1989); *United States v. Miller,* 874 F.2d 466, 470–71 (7th Cir. 1989) (skipping over category II without stating reasons). *But see United States v. Russell,* 905 F.2d 1439, 1443–44 (10th Cir. 1990). We find this rule persuasive based on the reasoning of the Second Circuit Court of Appeals:

The reason for obliging a judge to examine the next higher categories in sequence is that these categories reflect the Commission's careful assessment of how much incremental punishment a defendant should receive in light of the various degrees of a prior record. In formulating the Guidelines in general and the criminal history categories in particular, the Commission sought to implement a congressional policy of lessening disparity by narrowing, though not eliminating, the discretion of sentencing judges. At the same time, the Commission specified for each criminal history category a range of available sentences

---

10. Courts reach this conclusion by reference to section 4A1.3, which states in pertinent part:
 In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable. For example, if the court concludes that the defendant's criminal history category of III significantly under-represents the seriousness of the defendant's criminal history, and that the seriousness of the defendant's criminal history most closely resembles that of most defendants with a Category IV criminal history, the court should look to the guideline range specified for a defendant with a Category IV criminal history to guide its departure.
 U.S.S.G. § 4A1.3.

11. The concurring opinion to *Jones* noted the apparent conflict in the Fifth Circuit between *United States v. Lopez,* 871 F.2d 513 (5th Cir. 1989) and *United States v. Harvey,* 897 F.2d 1300 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 568, 112 L.Ed.2d 574 (1990). *See* 905 F.2d at 870 (Garwood, J., concurring). The panel in *Harvey* confined the requirement in *Lopez* to consider "lesser adjustments of the criminal history category and ... provide the reasons why such adjustments are inadequate," 871 F.2d at 515, to low criminal history categories, while apparently holding that this would not be necessary when the defendant starts with a high category. *See Harvey,* 897 F.2d at 1306. The panel in *Jones,* however, chose the *Lopez* rule even for high categories. 905 F.2d at 870.

... so that a sentencing judge could somewhat adjust the sentence to reflect the unique characteristics of each case. *Coe*, 891 F.2d at 413. We also agree with the Second Circuit's conclusions that:

> In light of the Commission's careful construction of the criminal history categories, when a judge concludes that a defendant's category is inadequate, a sentence in the range of the next higher category will usually be sufficient. At least that next category must be considered and found inadequate before considering an even higher category. We recognized in *Cervantes* that in extraordinary circumstances, even the highest of the six categories might be inadequate. But, as we noted, "[O]nly the most compelling circumstances—for example, prior misconduct accompanied by wanton cruelty" would justify a 4A[1.3] departure above Category VI.

*Id.* (quoting *United States v. Cervantes*, 878 F.2d 50, 55 (2d Cir.1989)).

It is clear that the court in this case failed to consider the criminal history categories in order, as we require. If the court, on reconsideration, still believes an upward departure is warranted, it must first consider criminal history category IV and state why that category does not adequately represent David's history before considering a higher category. Our assessment of the reasonableness of the district court's departure, if it does depart, must await satisfaction of the procedural requirements set forth in this opinion.[12]

## VIII.

For the aforementioned reasons, we affirm the convictions and sentences of James Joseph Flannery and Sarah and David Rusher in all respects, except that we vacate David's sentence and remand his case for resentencing in accordance with this opinion.

AFFIRMED IN PART, VACATED AND REMANDED IN PART WITH INSTRUCTIONS.

LUTTIG, Circuit Judge, concurring in part, concurring in the judgment in part, and dissenting in part:

I join Chief Judge Ervin's opinion for the court except sections II.B, VII.A, and VII.B. I concur only in the judgment reached in section II.B, and I dissent from the judgments in sections VII.A and VII.B.

The majority, in part II.B of its opinion, maintains that it is not required to decide the critical question of whether an objectively reasonable investigatory stop can ever be unreasonable under the Fourth Amendment because of the subjective intent of the investigating officer. The majority concludes that it need not decide this important question because the "same result" would obtain whether the court applied the objective or the subjective standard. The court reaches the conclusion that the disposition of this case would be identical under either standard, however, only because it misapplies the subjective standard in determining whether the investigatory stop of the defendants in this case was unconstitutionally pretextual. Properly applied, the subjective standard yields a result different from that that obtains under the objective standard. Therefore, in my view, the court must reach the question of which standard is mandated by the Constitution.

On the belief that the question must be addressed, I would adopt for this Circuit the so-called objective standard under which an investigatory stop is presumed to be reasonable under the Fourth Amendment where the driver has committed a traffic infraction or it otherwise appears that he is in violation of the law, regardless of the subjective state of mind of the investigating officer. *See United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir.1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Cummins*, 920 F.2d 498, 500–01 (8th Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct.

---

**12.** Because we vacate David's sentence on guidelines grounds, we do not consider his claim that the departure violated due process.

428, 116 L.Ed.2d 448 (1991); *United States v. Causey,* 834 F.2d 1179, 1184–85 (5th Cir.1987) (*en banc*). I believe that this standard is all but dictated by the Supreme Court's decisions in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), and *United States v. Villamonte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Applying this standard to the facts of this case, I would affirm the district court's denial of the defendants' suppression motions.

The majority's fundamental error is in its conclusion that this court can affirm the district court's judgment under the subjective standard. Under the subjective standard, an investigative stop is valid only if a reasonable officer *would* have made the stop even absent an illegitimate (*i.e.*, pretextual) motivation.[1] As it stands, the majority simply decides without any evidentiary foundation whatsoever that a reasonable officer would have effected a stop of appellants' vehicle because there was reasonable cause to suspect that defendants were in violation of two North Carolina laws: "[A] reasonable highway patrolman would have stopped the [defendants'] vehicle[because] it had two apparent violations." *Ante* at 876. This is nothing but a straightforward application of the objective standard that as long as the officer stops the vehicle for a violation of law, the stop is presumed not to be pretextual.

The majority states that it was not "clear error" for the district court to conclude that the investigatory stop of the defendants was not pretextual under the subjective standard, as if to suggest that the district court had properly applied the subjective standard and this court had only to

review the court's underlying findings that a reasonable officer (in North Carolina, for example) would have effected a stop under similar circumstances. *Id.* The district court, however, made no such findings. The district court misapplied the subjective standard in precisely the same way that the majority does herein. It, too, held that "the paper license plate and the fact that the occupants were not wearing seat belts are each independent bases for justifying Trooper Cardwell's decision to stop the truck." Memorandum Op. at 5 (Apr. 1, 1991). Indeed, the district court completely misunderstood the rule, as evidenced by its holding that the defendants "failed to demonstrate why a reasonable police officer would not have stopped the truck absent improper motive." *Id.* at 56 (emphasis added).

The fact is that there is no evidence in the record before us on which to base a conclusion that a "reasonable officer" in North Carolina, in the Middle District of North Carolina, or anywhere else, would stop a vehicle in such circumstances. *See, e.g., Guzman,* 864 F.2d at 1518 ("We have neither the evidence nor the necessary findings about objective reasonableness to permit us to apply the appropriate test."). There is no evidence in this record even as to whether seat belts were required in appellants' vehicle, and if so, whether appellants were required by state law to wear them,[2] or as to whether the cardboard license plate violated North Carolina law.[3] Thus, under the subjective rule, this case would have to be remanded to the district court for factual findings on whether a reasonable officer in whatever jurisdiction is deemed relevant (*i.e.*, state, regional, local or departmental) would have stopped appellants' vehicle because the vehicle's

---

**1.** Throughout this opinion, I refer to the rule adopted by the Tenth and Eleventh Circuits in *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988), and *United States v. Valdez,* 931 F.2d 1448 (11th Cir.1991), respectively, as the "subjective" standard, because it is fundamentally a rule that requires invalidation of objectively reasonable law enforcement actions if, by operation of the rule, the law enforcement officer is

deemed to have acted out of pretextual motives. *See* discussion *infra* at 887–88.

**2.** *See* N.C.Gen.Stat. § 20–135.2A(c) (exceptions to mandatory seat belt law).

**3.** *See* N.C.Gen.Stat. § 20–118.3 (prohibiting operation by nonresident of vehicle on North Carolina highway without registration plate issued by resident jurisdiction).

passengers were not wearing seat belts and the vehicle's license plate was "home-made." *See* discussion *infra* at 888.

Because the court cannot affirm the district court's judgment under the subjective standard, in my view it must decide between the objective and the subjective tests. For, as the majority concludes, there is no question that the district court's judgment can be affirmed under an application of the objective standard.

There is a substantial split in the circuits over whether a lawful investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), can ever be unconstitutional because of the subjective intentions of the investigating officer. *See Enriquez–Nevarez v. United States*, — U.S. —, 112 S.Ct. 428, 429, 116 L.Ed.2d 448 (1991) (White, J., dissenting from denial of certiorari). The subjective standard has been adopted in the Tenth and Eleventh Circuits. *See Valdez*, 931 F.2d at 1450–51;[4] *Guzman*, 864 F.2d at 1515–18. The objective standard has been adopted by the Fifth, Seventh, and Eighth Circuits, each of which has held that "so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *Trigg*, 878 F.2d at 1041; *accord Cummins*, 920 F.2d at 500–01 ("the stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions"); *Causey*, 834 F.2d at 1184–85 ("in a case where the officers have taken no action except what the law objectively allows

their subjective motives in doing so are not even relevant to the suppression inquiry").[5]

I believe the subjective standard of *Valdez* and *Guzman* is constitutionally flawed and manifestly impractical. The subjective standard requires that courts hold unconstitutional, and suppress all evidence of criminal activity obtained incident to, *an admittedly lawful* investigatory stop of a motor vehicle for suspected violations of law, unless it is established to the court's satisfaction that a "reasonable officer" *would have* stopped the vehicle in the same circumstances. Thus, under that standard, if after stopping a vehicle for exceeding the authorized speed limit by five miles per hour or for driving with license plates that expired the previous day, an officer discovers a kilogram of cocaine and an assault weapon used in a heinous murder, both the drugs and the weapon would be suppressed as the fruits of an unconstitutional stop unless the officer who effected the stop establishes *by affirmative evidence* that a "reasonable officer" also would have stopped the vehicle.

This standard is in palpable conflict with the Supreme Court's recent decisions in *Scott*, *Macon*, and *Villamonte-Marquez*, which hold that the constitutionality of an investigative stop depends on the objective facts known to the officer at the time of the stop, not on the subjective intentions of the individual officer. The focus of this standard on the "reasonable officer" suggests that its basic inquiry may in fact be objective. But its unmistakable

---

**4.** The Eleventh Circuit's decision in *United States v. Smith*, 799 F.2d 704 (1986), is often cited as having adopted the subjective standard. In *Smith*, however, the court had no occasion to address the issue of whether a lawful investigatory stop following observance of a traffic violation could nonetheless be invalid as pretextual because in that case the "car [was] being driven in accordance with all traffic regulations." *Id.* at 707. Indeed, the court expressly reserved decision on this issue. *Id.* at 709; *see also United States v. Strickland*, 902 F.2d 937, 940 (11th Cir.1990) (again reserving the question). It appears, however, that the Eleventh Circuit in *Valdez* extended *Smith* to the circumstance where officers observe traffic violations. It is worth noting, though, that the court did not even attempt in *Valdez* to determine whether a

"reasonable officer" would have effected the stop that the officer in that case had effected. *See* 931 F.2d at 1451.

**5.** *Cf. United States v. Nersesian*, 824 F.2d 1294, 1315–17 (2d Cir.) (upholding stop based on objectively reasonable suspicion of drug-related activities even though police resorted to pretextual justification for continuing detention and search), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *United States v. Hawkins*, 811 F.2d 210, 213–15 (3d Cir.) (validating stop based on officer's objectively reasonable suspicion of narcotics activity despite officer's later testimony that stop was for purpose of investigating traffic violation), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

purpose and effect, is to inquire into the subjective state of mind of the officer who conducts the stop.[6] Indeed, the effect of the standard is far more pernicious than even a required inquiry into the officer's motives would be, for the standard *presumes* unconstitutional intent from a failure to satisfy its "objective" element. If an officer were able to prove that his motives were not pretextual, his stop would still be held unconstitutional if the other officers on his force might not have stopped the vehicle in like circumstances. In effect, therefore, the standard is at best a stalkinghorse for precisely the kind of subjective intent inquiry forbidden by *Scott, Macon,* and *Villamonte–Marquez,* and at worst a more deleterious substitute for the subjective intent inquiry prohibited by those cases.

The burden imposed by this standard not only on law enforcement officials but on the courts is inestimable and its cost to effective law enforcement almost certainly enormous. Presumably, under this standard, almost every criminal defendant arrested following an investigatory stop would challenge the stop and the admissibility of any evidence of crime found during the stop on the grounds that the stop was pretextual.[7] There would then ensue within the suppression hearing—as I believe would now be required on remand—a lengthy and contentious mini-trial inquiring into whether police officers in the particular locale or region typically would or would not stop a driver for the infraction for which the defendant was assertedly stopped. *See Guzman,* 864 F.2d at 1518 (outlining the necessary inquiry into local police practices). The prosecution would be required to call police department officials and fellow police officers as witnesses to the existing and historical practices of not only the particular officer's department, but also other police departments in the locale or region. And there would be interminable disputes, followed by appeals, over

whether the particular offense that prompted the challenged stop is sufficiently similar to offenses for which it is established that a reasonable officer would effect a stop that the court may conclude that the "objective" standard is satisfied.

Apart from the substantial systemic costs in terms of judicial and law enforcement resources that would be exacted by this test, the ultimate effect of the rule would be devastating for law enforcement. Given the very nature of traffic infractions and the necessary discretion accorded officers with respect to these offenses, it would be virtually impossible for the government to meet the standard laid down by this rule. An officer perhaps could prove that his fellow officers *might* have effected a stop for a particular traffic offense; he will rarely, except for the most egregious offenses, however, be able to prove that they *would* have effected the stop. Whether an officer would or would not stop a vehicle for many of the routine kinds of traffic infractions depends more often than not on the specific circumstances at the time of the infraction, not on departmental policy or practice on stops for that particular violation.

Rather than the subjective standard adopted by the Tenth and Eleventh Circuits, I would adopt for this Circuit the objective standard adopted by the Fifth, Seventh, and Eighth Circuits. I would hold that at least where a driver has committed a traffic infraction or it appears that the driver and vehicle are otherwise in violation of existing law, a stop of that motor vehicle is reasonable under the Fourth Amendment, regardless of the subjective state of mind of the investigating officer and regardless of whether other officers would have stopped the vehicle for the same violations. I believe that such a holding is all but dictated by the principle that informed the Supreme Court's decisions in *Scott, Ma-*

---

6. The rule will not achieve even this purpose. The rule does not require, for example, suppression of evidence where the officer indisputably effected the stop for pretextual reasons, but a "reasonable officer" would also have stopped the vehicle.

7. The defendant in this case submits as proof that the officer's stop of his vehicle was pretextual no more than that the officer was accompanied by a narcotics detection dog, that he had recently completed drug detection courses, and that he had a high rate of stops and arrests.

*con,* and *Villamonte–Marquez.*[8] The Court could not have been clearer in those cases that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott,* 436 U.S. at 138, 98 S.Ct. at 1723 (Rehnquist, J.); *see also Macon,* 472 U.S. at 470–71, 105 S.Ct. at 2782–83 (O'Connor, J.) ("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." (citation omitted)); *Villamonte–Marquez,* 462 U.S. at 584 n. 3, 103 S.Ct. at 2577 n. 3 (Rehnquist, J.); *cf. Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force...") (Rehnquist, J.).[9] Indeed, I would think that such a holding is required by this court's decision in *Blair v. United States,* 665 F.2d 500 (4th Cir.1981), where then-Judge Ervin urged courts to "steer clear of excluding evidence discovered by objectively lawful means, even if the officers harbored bad faith intent." *Id.* at 506; *see also United States v. Corbitt,* 675 F.2d 626, 628–29 (4th Cir. 1982) (claim that arrest was illegal pretext for search incident upon arrest rejected by reference to only the existence of reason-

able and articulable suspicion for officers to make initial stop).

The now settled requirement that the officer have at least a reasonable suspicion that the motorist violated a law duly enacted by the representatives of the people is, as a general matter, I believe, a sufficient constitutional check on arbitrary enforcement of the laws, the concern for which has prompted other circuits to adopt the contrary rule. I share the underlying concern of these other courts for wholly arbitrary abuse of governmental power. In my view, however, the due process clause, *cf. Kolender v. Lawson,* 461 U.S. 352, 357–61, 103 S.Ct. 1855, 1858–60, 75 L.Ed.2d 903 (1983), and, where appropriate, the equal protection clause, *cf. Oyler v. Boles,* 368 U.S. 448, 454–56, 82 S.Ct. 501, 504–06, 7 L.Ed.2d 446 (1962) (dictum), constitute adequate protection and remedy against such abuses of the public's trust. *See also Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 2308–09, 110 L.Ed.2d 112 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.") (Stevens, J.).

I also dissent from the judgment reached by the court in section VII.A of its opinion. Although I concur in the majority's conclusion that the guidelines allow old convictions to be used as reliable information for a departure even if the convictions are not evidence of similar misconduct, I disagree with its ultimate holding that the district court in this case failed to state sufficiently

**8.** Neither *Smith* nor *Guzman* distinguishes either *Scott* or *Macon.* In *Guzman,* the Tenth Circuit consigns its discussion of *Scott* and *Macon* to a footnote, suggesting only that those cases "did not emphasize the arbitrariness problem because it was not before the Court," given that the officers in *Scott* had a warrant and there was no seizure in *Macon,* 864 F.2d at 1516 n. 3. The Eleventh Circuit in *Smith* assumes that its rule is consistent with *Scott* and *Macon* merely because it does not focus expressly on the subjective intent of the officer effecting the stop. It ignores the fact that not only the purpose but the effect of its rule is to invalidate any stop that, according to its "objective" test, was undertaken for subjectively pretextual reasons.

Significantly, neither *Smith* nor *Guzman* cites or discusses *Villamonte–Marquez.* In *Villa-*

*monte–Marquez,* the Supreme Court summarily rejected an argument that the suspicionless boarding of a vessel at sea under statutory authority that provided for the boarding of any vessel to examine documents could nonetheless be violative of the Fourth Amendment because the boarding was actually effected for the purpose of searching for drugs. 462 U.S. at 584 n. 3, 103 S.Ct. at 2577 n. 3.

**9.** As the Court noted in *Scott,* the subjective motivation of the officer effecting the stop is relevant, if at all, "only after it has been determined that the Constitution was in fact violated." 436 U.S. at 139 n. 13, 98 S.Ct. at 1724 n. 13; *see also id.* at 135–37, 98 S.Ct. at 1722–23.

on the record its reasons for the upward departure to David Rusher's sentence. As the majority itself notes, *ante* at 881, the district court expressly adopted Rusher's presentence report, J.A. at 540, which included a list of Rusher's prior offenses, *id.* at 589–95, and a recommendation for an upward departure on the grounds that criminal history category III did not adequately reflect the seriousness of his past criminal conduct as evidenced by the numerous old convictions, *id.* at 599. The report specifically recommended a criminal history category of VI as more accurately reflecting the seriousness of Rusher's criminal conduct, which included repeat offenses since the age of 15 indicating a strong likelihood that he will continue to commit other crimes. *Id.* In my view, the court's adoption of this presentence report and its specific recommendations is ample basis upon which to review and affirm the district court's upward departure. In fact, I would not hesitate to affirm the district court's departure based solely upon the court's discussion of its decision quoted by the majority *ante* at 882–83.

I dissent, finally, also from section VII.B of the opinion in which the court concludes that the district court must specifically consider and reject progressively each criminal history category between the base criminal history category and the category upon which the defendant's sentence is ultimately based. U.S.S.G. § 4A1.3 embodies no such requirement. The section simply recommends that the court, in its departure calculation, "use[ ] as a reference" the criminal history category that includes the conduct which most closely resembles the defendant's prior conduct. The courts that have imposed an affirmative requirement of the kind embraced by the majority have done so wholly without textual foundation.[10] The only consolation that can be

taken from the majority's decision to proceed with an interpretation of section 4A1.3 is that its discussion is clearly dictum because the court vacates Rusher's sentence on the ground that the district court failed to explain adequately its departure decision. Thus, another panel of this court will, when the opportunity presents itself, be free to reconsider, in light of the section's actual text, the interpretation adopted by the majority today.

---

10. Of the decisions cited by the majority, only four actually hold that the district court must perform the task that the majority herein would impose. *See United States v. Jones,* 905 F.2d 867, 870 (5th Cir.1990); *United States v. Allen,* 898 F.2d 203, 204–05 (D.C.Cir.1990) (*per curiam*); *United States v. Kennedy,* 893 F.2d 825, 828–29 (6th Cir.1990); *United States v. Coe,* 891 F.2d 405, 412–13 (2d Cir.1989). The remaining

decisions cited by the majority either did not adopt the rule ascribed to them or, like the majority in this case, did so only in *dictum*. *United States v. Calderon,* 935 F.2d 9, 12 (1st Cir.1991) (*dictum*); *United States v. Richison,* 901 F.2d 778, 781 (9th Cir.1990) (*dictum*); *United States v. Anderson,* 886 F.2d 215, 216 (8th Cir.1989); *United States v. Miller,* 874 F.2d 466, 470–71 (7th Cir.1989).