36 F.3d 1094
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gary FRANCIS, a/k/a Jeff Jackson, a/k/a John Frances,
Defendant-Appellant.
 No. 93-5970.
 United States Court of Appeals, Fourth Circuit.
 Submitted June 14, 1994.
Decided Sept. 30, 1994.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Chief District Judge. (CR-93-45-CR-F)
 Bridgett Britt Aguirre, Fuquay-Varina, NC, for appellant. Janice McKenzie Cole, U.S. Atty., David P. Folmar, Jr., Special Asst. U.S. Atty., Raleigh, NC, for appellee.
 E.D.N.C.
 AFFIRMED.
 Before WIDENER, HALL, and WILLIAMS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Gary Francis appeals his conviction for possession with intent to distribute crack cocaine. We reject his argument that the district court improperly denied his motion to suppress evidence seized following an investigatory stop at a Rocky Mount, North Carolina train station. We therefore affirm the conviction.
 
 
 2
 We review de novo the legal conclusions involved in a suppression determination. Factual determinations informing those legal conclusions are reviewed under the clearly erroneous standard. United States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied, 61 U.S.L.W. 3285 (U.S.1992).
 
 
 3
 Testimony at the suppression hearing revealed that Agent Tellefsen, who had participated in over 200 drug interdictions in northeastern North Carolina, was assigned on November 23, 1992, to the Rocky Mount train station. Prior to the arrival of a southbound train, Tellefsen checked the passenger manifest to see if any passengers on the train had left from a "source city" for drugs. Tellefsen testified that New York was such a source city, and that roughly ninety percent of the crack seized in his area originated in New York.
 
 
 4
 Tellefsen's review of the manifest disclosed that one passenger, J. Francis, was scheduled to arrive in Rocky Mount at approximately 12:30 a.m. on November 24. Only one other passenger, a female with a family emergency, was scheduled to depart the train at Rocky Mount. Francis had made his reservation on the morning of November 23, had paid for his one-way ticket with cash, had paid a premium for a sleeper car, and had purchased the ticket only six to nine minutes prior to the train's departure. These actions were, in Tellefsen's experience, consistent with the behavior of individuals who were involved in illegal drug activity.*
 
 
 5
 Tellefsen's suspicions also were aroused when he investigated the telephone number in Brooklyn that was listed beside Francis' name on the passenger manifest. Tellefsen called directory assistance and learned that the number was not listed in the name of J. Francis. Tellefsen also called the number. A man with a Jamaican accent answered and initially denied ever having heard of Francis. As the conversation continued, however, the man remembered that someone possibly had left from that address for a train station. The man could not, however, describe the person, say where he was traveling, or identify the purpose of the trip.
 
 
 6
 The train arrived in Rocky Mount at approximately 1:00 a.m. Officers observed Francis, who was carrying a shoulder bag, exit the train. He headed towards a waiting car, where officers approached him. Francis tossed the bag in the back seat of the car. Francis agreed to speak to Tellefsen, who had identified himself. After Francis handed Tellefsen his ticket stub, as requested, Tellefsen asked if Francis had any other identification. Francis grew very nervous and stated that he did not. He motioned for the driver of the car to get out of the vehicle, turned his back to the officers, and whispered to the driver. Tellefsen could barely hear the conversation; however, he did hear the words "the bag" repeated.
 
 
 7
 Tellefsen, whose suspicions were aroused and who was concerned about his and his partner's safety, informed Francis that he and his bag would be detained and that Francis should walk to the station with the officers, where a trained dog would sniff the bag to see if it contained drugs. After walking ten to fifteen yards, Francis ran away. Tellefsen caught up with him, and the two men wrestled. Tellefsen informed Francis that he was under arrest. Francis continued to struggle, and struck Tellefsen at least twice. Help arrived, and Francis was handcuffed.
 
 
 8
 He was taken to the police station. A "bag lineup," including the bag which Francis had carried, was conducted. A drug dog alerted at the bag. Officers obtained a search warrant, and a search of the bag yielded a quantity of crack.
 
 
 9
 A police officer may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, based on articulable facts, that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). This Court has elaborated on the Terry standard:
 
 
 10
 The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect.
 
 
 11
 United States v. Crittendon, 883 F.2d 326, 328 (4th Cir.1989). Reasonable suspicion is a "commonsensical proposition. Courts are not remiss in crediting the practical experience of officers" in determining whether reasonable suspicion exists. United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993).
 
 
 12
 After a de novo review of the testimony at the suppression hearing, we are convinced that the officers had sufficient, articulable facts to reasonably suspect Francis of criminal activity. Therefore, the officers were justified in stopping and briefly detaining Francis. We note in particular that: the train left from New York, a source city for crack; typical of drug dealers, Francis paid for his one-way ticket in cash only minutes before the train's departure; he requested a sleeper car, which again is a common practice of drug traffickers; and Tellefsen had a suspicious conversation with the person in Brooklyn who gave evasive and inconsistent answers to Tellefsen's questions. These are among the factors, which, taken together, gave the officers the "minimal level of objective justification" required to justify the brief stop and detention under Terry. See INS v. Delgado, 466 U.S. 210, 217 (1984).
 
 
 13
 Accordingly, we hold that the district court properly denied the suppression motion. As our review of the record and other materials before us reveals that it would not significantly aid the decisional process, we dispense with oral argument.
 
 
 14
 AFFIRMED.
 
 
 
 *
 Tellefsen testified as to the significance of the sleeper car. He stated that the train left New York at approximately 3:30 p.m. and was scheduled to arrive in Rocky Mount at approximately 12:30 a.m. As the trip took place during normal waking hours, it was unusual to request a sleeper for this trip. Tellefsen's experience was that people involved in the drug trade often traveled in sleeper cars because of the added privacy and the increased opportunity to secrete contraband