UNITED STATES of America,
Plaintiff–Appellee,

v.

Jesus I. VALDEZ, Defendant–Appellant.

No. 90–5126.

United States Court of Appeals,
Eleventh Circuit.

May 22, 1991.

Philip M. Gerson, Miami, Fla., for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., Linda C. Hertz, Dawn Bowen, and Terry Lindsey, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and KAUFMAN *, Senior District Judge.

FRANK A. KAUFMAN, Senior District Judge.

Once again, as in *United States v. Miller*, 821 F.2d 546 (11th Cir.1987), and *Unit-*

---

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting  by designation.

*ed States v. Smith,* 799 F.2d 704 (11th Cir.1986), "the issue in this case is whether the stop of appellant['s] vehicle was reasonable under the fourth amendment." *Smith* at 705. The district court upheld the stop as a valid enforcement of the traffic laws. We disagree and reverse. However, we also remand to the district court to determine whether there was or was not probable cause to stop appellant's vehicle and to search it for narcotics for reasons unconnected with the traffic stop.

## I.

On the afternoon of May 8, 1989, Detective Houck and Special Agent Hills of the Metropolitan Dade County Police Department conducted surveillance of a residence located in Miami, Florida. From an unmarked police car Houck observed appellant Valdez arrive in front of the residence in a Honda Accord. Valdez exited the Honda, knocked on the front door of the residence and was admitted inside. Shortly thereafter, two other men, subsequently identified as Jose Fernandez and Jorge Fernandez, Valdez's co-defendants in the proceeding below,[1] exited the house, moved two cars parked in its yard, and then moved the Honda so that the trunk of the Honda was in close proximity to the front door of the residence. The two men opened the Honda's trunk, reentered the residence and came out within the next few minutes carrying plastic garbage bags, which, Houck noted, appeared to be fairly heavy. The two men placed the garbage bags in the trunk of the Honda, reentered the residence and very quickly left the residence again, carrying additional bags which they also placed in the trunk. Shortly thereafter, Valdez came out of the residence, got into the Honda and drove away.

Detective Trujillo, the lead investigator of the Dade County narcotics team, of which Houck and Hills were members, monitored the police radio from another location for information from Houck and Hills about events occurring at the residence. Trujillo was joined by Officer Al-

maguer, a uniformed Metro patrol officer who was dispatched by Trujillo to assist the narcotics investigation team. Trujillo testified in the court below, in a hearing involving Valdez's motion to suppress the fruits of a search by Almaguer of the Honda, that he advised Almaguer that:

> [W]e were conducting an investigation and we had a vehicle we wished for him to follow, and if that person was to commit a traffic infraction which he normally cites somebody for, we wished for him to stop the vehicle.
>
> If that occurred, and he did stop the vehicle, I wanted him to ask the occupant of the vehicle for consent to search the vehicle, and I instructed him to ask him if he would consent to a search.[2]

However, Almaguer testified during the suppression hearing that he did not recall Trujillo's qualification that he (Almaguer) had been directed to stop the Honda only for something which constituted the kind of traffic offense for which he would ordinarily stop a driver.

Over the police radio Houck provided Trujillo with a description and the tag number of the Honda and reported when Valdez drove away from the residence. Houck left his surveillance position at the residence and followed the Honda to 122nd Avenue where he confirmed that Trujillo had correctly identified the Honda. As Valdez approached the intersection of 8th Street and 122nd Avenue, Trujillo was positioned across that intersection with Almaguer in a patrol car directly behind him. The Honda made a right turn against a red traffic light signal. As or immediately after Valdez made that turn, another automobile, travelling from the left of the spot at which Valdez made his turn, slowed down abruptly in order to avoid a collision with Valdez's car. Both Trujillo and Almaguer testified that they observed Valdez violate the right-of-way of that other automobile. However, neither officer was able to state the speed at which that other vehicle was travelling before it so slowed down, nor did

---

1. Neither Fernandez is a party to this appeal.

2. Transcript at 14.

**1450**

either Trujillo or Almaguer hear any screeching of the tires of that car.

After the Honda turned right, Trujillo informed Almaguer that the driver of that vehicle was the subject of the narcotics investigation being then conducted. Almaguer followed the Honda eighteen blocks from the intersection at which the traffic violation had occurred and then stopped it. Trujillo, parked two blocks away from the point of that stop, observed Almaguer conduct the stop. Almaguer approached Valdez and asked for Valdez's driver's license and registration. Valdez produced his driver's license and explained that a friend had loaned the car to him. The conversation was in Spanish. Almaguer next asked Valdez whether he was aware of why Almaguer had stopped him, to which question Valdez answered "yes." Almaguer testified that he asked Valdez for permission to search the car and Valdez consented. After searching the interior of the car, Almaguer found five sealed trash bags inside the trunk, and asked Valdez what was inside the bags. Valdez replied that it was cocaine. Almaguer then placed Valdez under arrest, handcuffed him, and placed Valdez in the back of Almaguer's patrol car until Trujillo arrived on the scene. Almaguer issued Valdez a citation for violation of the right-of-way. Thereafter, Trujillo advised Valdez of his *Miranda* rights.

During the suppression hearing in the district court, Almaguer stated that but for Trujillo's instructions that the Honda was the car which the narcotics unit wanted stopped, he (Almaguer) would not have pursued the car and issued the traffic citation. Almaguer also testified that he ordinarily did not search a vehicle for a violation of a right-of-way, or even ask its driver for his consent to search and that, based solely on the traffic violation which he had observed, he had no reason to ask permission to search Valdez's car.

## II.

▮ The district court concluded that the traffic stop was objectively justified and

was not pretextual. When a defendant raises such a claim of pretextuality, "the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation," *Smith* at 708 (emphasis in original), and requires " 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time of the challenged action taken." *Id.* at 709, quoting *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370. "[I]n determining when an investigatory stop is unreasonably pretextual, the proper inquiry, again, is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *Smith* at 709 (emphasis in original), citing and relying upon *United States v. Cruz,* 581 F.2d 535 (5th Cir.1978) (en banc), as a binding precedent.[3] As to *Cruz,* Judge Kravitch wrote in *Smith* that "[t]he stop [in *Cruz* ] was unreasonable not because the officer secretly hoped to find evidence of a greater offense, but because it was clear that an officer would have been uninterested in pursuing the lesser offense absent that hope." *Id.* at 710.

In *Smith,* a Florida State Trooper, concluding that Smith's car matched a drug courier profile, followed the car for about a mile and a half, observed it cross over six inches into the emergency lane, and stopped it. In rejecting the government's contentions that, pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the officer validly made the stop because of reckless driving or failure to change lanes safely, this court noted that the deviation from the lane was about six inches, that only slight "weaving" within a single lane was involved, that the officer had no interest in investigating possible drunk driving, and that before the officer observed any traffic violation, he had insti-

---

**3.** In *Smith* at 710 n. 8, this Court, in considering itself bound by *Cruz,* noted that "[i]n *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981."

tuted the pursuit because of his thoughts concerning drug involvement. In this case, also, it was the officers' interest in drug matters which brought about the surveillance of the residence and the trailing of the Honda.

In *United States v. Miller,* 821 F.2d 546 (11th Cir.1987), "[t]he facts ... are nearly identical to those in [*Smith*]." *Id.* at 546. In *Miller,* the same Florida officer who was involved in *Smith* testified that he would have made the stop regardless of whether there had been a traffic violation. Judge Clark, writing for this court, reversed the district court's denial of Miller's motion to suppress, concluding that the stop had been made due to the officer's hope of catching a drug courier and not because Miller had momentarily strayed a few inches over the white line, and that, therefore, the stop was pretextual.

■ In reaching its conclusion that the stop in this case was objectively justified and not pretextual, the court below stated that "the uniformed patrol officer was charged with enforcing Florida traffic laws, '... and this Court can presume no less than that a patrol officer would obey this mandate,'" quoting *United States v. Bates,* 840 F.2d 858, 860 (11th Cir.1988). However, in *Bates,* the officer testified that it was his practice to stop cars for following too closely and that he had made the traffic stop and had issued the citation for that reason. By way of contrast, in this case, we note again that Almaguer testified that he would not have pursued Valdez and issued a citation in the absence of Trujillo's instructions that the narcotics unit wanted the car stopped, and that Almaguer did not recall Trujillo's instruction that a traffic stop should be made only for the kind of offense for which Almaguer would normally stop a motorist. Considered in that context, we conclude that the objective evidence reveals that Trujillo and Almaguer would have been uninterested in pursuing

Valdez' violation of the right-of-way absent their hope of finding evidence of violation of the narcotics laws. Accordingly, we hold that the stop in this case was unreasonably pretextual and unconstitutional.

## III.

■ There remains the question of whether Almaguer's search of the car can nevertheless be sustained as one to which Valdez voluntarily consented. The district court held that the traffic stop was not pretextual. In addition, the district court concluded, applying the standard that " 'voluntariness [of consent] is a question of fact to be determined from all the circumstances' when evaluating the validity of a consent to search," *United States v. Garcia,* 890 F.2d 355, 358 (11th Cir.1989), *citing and quoting Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973), that Valdez freely consented to the search of the vehicle, including the trunk, and also voluntarily commented, in answer to Almaguer's question, concerning the contents of the bags. Such determinations by a district court with regard to voluntariness of consent to search, while entitled to great deference by a reviewing appellate court, must still be overturned if clearly erroneous. *See Garcia* at 359; *United States v. Alegria,* 721 F.2d 758, 761 (11th Cir.1983).

■ In this case, the only evidence in the record before us pertaining to the issue of voluntariness of Valdez's consent is the testimony of Almaguer.[4] In an instance in which "the decision the district court made was based solely on the circumstances described through uncontradicted testimony of the agents whose credibility was unquestioned, we believe that we are in as good a position as the district court to apply the law to the uncontroverted facts. *See United States v. Rioseco,* 845 F.2d 299, 302 (11th Cir.1988) ('[W]e give plenary review

---

**4.** In that regard, the trial judge stated: "Almaguer asked for permission to search the vehicle. No pressure was applied. No weapons were displayed. The conversation was in Spanish. Valdez consented and handed Almaguer the keys. When the officer opened the trunk, he observed five trash bags that were sealed. I asked him what was inside the bags and he told me it was, that it was cocaine." Almaguer was the only officer present when consent was requested.

to the application of law to the facts')." *Garcia*, 890 F.2d at 360 n. 5. Accordingly, we review *de novo* the district court's determination of voluntariness of Valdez's consent to search.

In *United States v. Berry*, 670 F.2d 583 (5th Cir.1982) (en banc), Judge Johnson wrote that "[i]n order to eliminate any taint from an involuntary seizure or arrest, there must be proof that the consent was voluntary and that it was not the product of the illegal detention. Among the [relevant] factors ... are the temporal proximity of an illegal arrest and confession, intervening circumstances, and the purpose and flagrancy of the official misconduct." *Id.* at 604–05 (footnote omitted) (citations omitted). Holding that the consent to search in *Berry* was voluntary, Judge Johnson emphasized (at 605) that despite the "temporal proximity" of the request and the consent, there were substantial intervening circumstances, including, that the defendants were told that they were free to refuse consent to search and that they could consult with an attorney. However, in *Berry*, the "[c]ritical considerations [were] that appellants were allowed to consult with each other" and that the officer "invited [the defendants] to use a telephone when [one defendant] indicated that she might want to contact an attorney." *Id.* at 605.

Judge Clark applied the *Berry* standard in *Miller*, 821 F.2d at 549, in assessing the issue of whether there existed a voluntary consent to search following an illegal traffic stop. In *Miller*, the officer requested the defendant's consent to search the vehicle almost immediately upon the stop. Although the consent form signed by Miller indicated that it was voluntary, Judge Clark noted that the extent to which the officer emphasized Miller's right to withhold consent was unclear. Referring (*id.* at 550) to the Supreme Court's recognition that "a traffic stop is an 'unsettling show of authority' that may 'create substantial anxiety,'" *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979), Judge Clark concluded in *Miller* that "there were insufficient intervening circumstances that might have reduced the coercive nature of the stop and permitted [Miller] to make a voluntary decision about the consent to search."

█ Applying the standard of *Miller* and *Berry* in this case, we hold that Valdez's consent was tainted by the illegal pretextual stop and detention. Herein, immediately after requesting to see Valdez's driver's license and then asking whether Valdez was aware of why he had been stopped, Almaguer asked Valdez for the latter's consent to search the Honda, informing Valdez that Valdez did not have so to consent. While such an admonishment was recognized in *Berry* as a factor indicating that the taint from the illegal detention was attenuated, we conclude that that factor alone is not determinative. Unlike the defendants in *Berry*, Valdez was not afforded an opportunity to consult with an attorney; nor was he given by Almaguer any appreciable time in which to reflect upon whether to give or not to give his consent to search the vehicle. While the actions of the police in this case can certainly not be described as flagrantly unconstitutional conduct, it is clear, as Almaguer himself has stated, that he had no reason connected with the traffic stop itself to ask Valdez for permission to search the Honda.

## IV.

Under the circumstances of this case, we hold that the stop of Valdez was pretextual and that Valdez's consent to search was not voluntary. Accordingly, we reverse. However, a remand is also required in order for the district court to decide whether there was or was not probable cause for one of the police officers involved in the narcotics investigation to stop Valdez for violation of the narcotics laws in connection with what Houck and Hills observed during their surveillance of the residence. It may be that such probable cause was present. As to that possibility, we express no view.

REVERSED AND REMANDED.