665 So.2d 1040 (1995)
STATE of Florida, Petitioner,
v.
Alan DANIEL, Respondent.
No. 84486.
Supreme Court of Florida.
September 28, 1995.
Rehearing Denied January 4, 1996.
*1041 Robert A. Butterworth, Attorney General, James W. Rogers, Senior Assistant Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, for Petitioner.
Nancy A. Daniels, Public Defender, and Abel Gomez, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Respondent.
KOGAN, Justice.
We have for review a district court decision certifying the following question to be of great public importance:
DOES THE RULING IN KEHOE V. STATE, 521 So.2d 1094 (FLA. 1988), REQUIRE SUPPRESSION OF EVIDENCE OBTAINED AS A RESULT OF THE STOP OF A MOTOR VEHICLE FOR A MINOR TRAFFIC VIOLATION WHERE THERE IS NO EVIDENCE THAT THE STOP WAS PRETEXTUAL, BUT THE STATE FAILS TO AFFIRMATIVELY ESTABLISH BY EVIDENCE THAT A REASONABLE POLICE OFFICER WOULD HAVE ROUTINELY STOPPED A MOTOR VEHICLE FOR THE SAME VIOLATION?
Daniel v. State, 647 So.2d 220, 221-22 (Fla. 1st DCA 1994). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
Alan Daniel was arrested in Jacksonville on May 10, 1992, for possession of cocaine and paraphernalia. Sergeant Bobby Lawrence Deal said he made the initial stop of Daniel based on his observation that Daniel's windshield had a large crack and a windshield wiper stuck directly across the driver's view. Sergeant Deal said he intended to give Daniel a warning, but he made the arrest after Daniel was unable to produce a driver's license  a violation of Florida traffic laws. Deal said standard procedure called for arrest in that circumstance, although Deal conceded the arrest occurred in an area known for prostitution and drug peddling. During a subsequent pat-down search, cocaine and a crack pipe were found in Daniel's clothing. The trial court denied the motion to suppress, and Daniel pled no contest, reserving his right to appeal. On appeal, the First District reversed.
The present case poses an issue that has resulted in a three-way split of authority among jurisdictions of the United States: how to determine what constitutes an impermissible pretextual traffic stop for Fourth Amendment purposes.[1] While we are bound by any apposite holdings of the United States Supreme Court on Fourth Amendment issues, Perez v. State, 620 So.2d 1256 (Fla. 1993), it is not entirely clear which of the competing approaches to this issue the Court would favor. We therefore must begin by examining each in light of what we know of the Court's views on similar subjects.
The First District Court of Appeal of California has ably outlined the competing approaches, which may be described in the following terms. The first approach is the "subjective test," which attempts to inquire into the actual subjective reasons why the officer made the stop. The second is the "objective test," which ignores subjective matters and asks only if the officer was objectively authorized and legally permitted to make the stop in question without regard to any pretextual motive. And the third approach is the "reasonable officer test," which refines the objective test by also asking whether the stop  if occasioned by a *1042 minor infraction  was of a kind falling within the usual practices of the same or similar agencies. People v. King, 34 Cal. App.4th 1576, 36 Cal. Rptr.2d 365, 368 (1994).
We agree with the California appeals court, id., that the United States Supreme Court most probably has disfavored the "subjective test" in its policy statements on Fourth Amendment law. In Scott v. United States, 436 U.S. 128, 137-38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), the Court stated:
[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.
(Emphasis added.) Although this statement arose from a factually distinguishable case, we nonetheless consider it as a statement of policy underlying the Fourth Amendment. Elsewhere we have noted that policy statements from the United States Supreme Court will serve as a polestar in choosing among competing and unreconciled views of Fourth Amendment issues. Johnson v. State, 20 Fla. L. Weekly S347 (Fla. July 13, 1995). Moreover, a subjective inquiry into the thought processes of police is too nebulous a standard. It would tend to authorize the courts, through cold scholarly inquiry, to second-guess decisions that often must be made in the heat of stressful and rapidly changing events on the streets of our cities and counties.
This conclusion is further supported by policy statements in yet another factually distinguishable case from the nation's high Court. In Maryland v. Macon, 472 U.S. 463, 470-71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985), the Court quoted its own opinion in Scott in making the following remarks:
Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," Scott v. United States, 436 U.S. 128, 136, 98 S.Ct. 1717, 1722, 56 L.Ed.2d 168 (1978), and not on the officer's actual state of mind at the time the challenged action was taken. Id., at 138 and 139, n. 13, 98 S.Ct., at 1724, n. 13.
(Emphasis added.) This language clearly disfavors a subjective test. Ironically, this quotation has been cited by the Eleventh Circuit Court of Appeals as the authority mandating the reasonable officer test, United States v. Valdez, 931 F.2d 1448, 1450 (11th Cir.1991); United States v. Smith, 799 F.2d 704, 708-09 (11th Cir.1986), even as other courts have cited it in support of the competing objective test. King, 36 Cal. Rptr.2d at 369.
The confusion evident in the case law is perhaps understandable: Both the "objective test" and the "reasonable officer" test are objective in the sense that they resort solely to provable facts. And the United States Supreme Court seems to have said little more than that an objective test of some variety is required. Accordingly, we now turn to a comparison between the objective and reasonable officer tests, considering them in light of Fourth Amendment policy considerations.
The objective test has great appeal because of its simplicity. Under this test, the sole question is whether the law permitted the stop in question for any reason. In sum, could the officer make the stop? If any lawful reason exists to say "yes," then courts following this test inquire no further. Id. at 368. We ourselves, however, have noted the major flaw in this simplistic test:
We decline to adopt the ... "could arrest" approach. Although it is the easiest test to follow, the fourth amendment constraints on intrusive unlimited searches and seizures transcend other concerns. Allowing the police to make unlimited stops based upon the faintest suspicion would open the door to serious constitutional violations. It is difficult to operate a vehicle without committing some trivial violation  especially one discovered after the detention.
Kehoe v. State, 521 So.2d 1094, 1097 (Fla. 1988). In sum, the objective test would authorize stops for the slightest infractions, however unrelated those infractions may be to the true motive for the stop.
*1043 We also find that the language in Macon, quoted above, is more consistent with the reasonable officer test than the objective test. Under Macon, the court's duty is to make an objective assessment of officers' actions in light of the facts and circumstances confronting them at the time of a stop. Macon, 472 U.S. at 470-71, 105 S.Ct. at 2783. We find that this language contemplates a more individualized approach than is possible under the objective test. It is difficult to say that the reviewing court has conducted an assessment of officers' actions in light of the relevant facts and circumstances if that court is merely looking for any legal justification for the stop, even where a pretext may be transparently obvious.
The reasonable officer test is better suited for an individualized inquiry because it also asks whether the usual police practice would be to effect a stop when confronted with a particular kind of minor infraction. In sum, would the officer have effected the stop absent any improper motive? If the answer is "yes," then the stop was lawful even if a pretextual motive may have influenced the officer's actions. As is obvious, this test by definition would never bar a stop where there is probable cause to suspect more serious offenses, including felonies or crimes involving harm or the threat of harm to others, or where exigent circumstances exist. More serious offenses always will provide independent justification, however pretextual the stop may be. Rather, the reasonable officer test applies exclusively where a stop is justified solely by a minor infraction, generally those that are purely regulatory in nature and that do not address conduct potentially harmful to other persons or property.
Admittedly, the contours of this test have not been worded with much precision in the past, which undoubtedly has led to some of the criticisms leveled at it. Those who read the test apart from its application to facts have been tempted to dismiss it as a misguided effort to elevate ever-changing "usual police practices" to the status of law. One court, moreover, has opined that the reasonable officer test  carried to its logical conclusion  "would invalidate a traffic stop that departs from routine practices even where there is no allegation or evidence of a pretextual purpose." King, 36 Cal. Rptr.2d at 369.
We frankly find these criticisms incorrect. A close reading of the facts and outcomes of the "reasonable officer" cases shows they are wholly focused on the problem of stops for minor infractions that are solely and objectively pretextual  something the "objective test" itself utterly fails to do. For example, the reasonable officer test apparently originated in the Eleventh Circuit's opinion in Smith, 799 F.2d at 708, a case that arose out of Florida. In that appeal, the Eleventh Circuit confronted a situation in which Florida Highway Patrol Trooper Robert Vogel effected a traffic stop based on a "drug courier profile" described in the following terms:
Trooper Vogel stopped a car because two young men were traveling at 3:00 a.m. in an out-of-state car being driven in accordance with all traffic regulations.
Id. at 707. The Smith court concluded that this "profile" did not justify the stop because it merely disguised an objectively unreasonable "hunch." Id. at 708. The Eleventh Circuit expressly labeled Trooper Vogel's profile a mere pretext. Id.
Likewise, in Valdez, 931 F.2d at 1449-50, the Eleventh Circuit confronted a case in which a Dade County narcotics team gave an order to the arresting officer described in the following manner:
[W]e were conducting an investigation and we had a vehicle we wished for [the arresting officer] to follow, and if that person was to commit a traffic infraction which he normally cites somebody for, we wished for him to stop the vehicle.
Id. at 1449. The arresting officer himself testified that he would not have effected the stop in question had he not received this instruction. Based on these facts, the Eleventh Circuit concluded that the stop was sheer pretext and the evidence obtained because of the stop was inadmissible. Even then, the Eleventh Circuit remanded for the district court to determine whether the stop was validly based on a separate ground: probable cause that the arrestee was involved in narcotics trade. Id. at 1452.
*1044 Perhaps the most telling of the Eleventh Circuit's cases is United States v. Bates, 840 F.2d 858 (11th Cir.1988). There, the court confronted a case in which a Georgia officer stopped a car for following too closely behind another vehicle. After the stop, contraband was found in the car. In rejecting the defendant's claim of a Fourth Amendment violation, the Eleventh Circuit made the following remarks:
The district court specifically determined that Bates was arrested because of his traffic violation and not because of the officers' suspicions. [The arresting officer] testified at trial that it was his practice to stop cars for following too closely. Based on this testimony and finding, we must conclude that the arrest of Bates was not pretextual: the patrol officers of Georgia are charged with enforcing Georgia's traffic laws, and this court can presume no less than that a patrol officer would obey this mandate.
Id. at 860. We believe this language means that a stop for a minor infraction cannot be deemed pretextual on appeal where (1) the officer was acting within the proper scope of lawful authority, and (2) the record below contains competent substantial evidence that the stop was not objectively pretextual without regard to any subjective intentions, as demonstrated by the fact it was a usual police practice,[2] and (3) the trial court has so found.
Apart from a few early Florida district-court cases,[3] state decisional law is in general accord with the Eleventh Circuit's analysis. Our opinion in Kehoe, for example, addressed a situation in which the State justified a stop on two bases. First, the State argued that probable cause arose when officers observed men pulling a heavily loaded unregistered boat from the water onto a trailer and hastily driving away with it. Second, the State contended that the stop was justified based on the fact that the vehicle pulling the boat had a bent license plate.
We accepted the first of these arguments based on a "cumulative impact" analysis, in which we found that the totality of the circumstances observed by the officers created probable cause to believe the defendants were trafficking in contraband.[4] However, we rejected the second argument on grounds that the bent license plate at best was a pretext based "on some obscure traffic violation." 521 So.2d at 1096. As is obvious from this holding, the fact that a stop fails under the reasonable officer test does not warrant dismissal of evidence if some other valid basis for the stop existed, including a probablecause arrest or arrest by warrant. Accord Valdez.
The law on this subject was further illuminated by Doctor v. State, 596 So.2d 442 (Fla. 1992). There, we confronted a stop occasioned by "a crack in the innermost lens of the left taillight assembly." Id. at 446. To determine whether the stop was pretextual, we first examined Florida traffic laws and found that they required only two functioning red tail lamps visible from a distance of 1,000 *1045 feet to the rear. Id. Because the crack in the lens did not render the lamp contrary to the statute, we found no valid reason for the stop on that basis. Likewise, we rejected the State's argument that section 316.610, Florida Statutes (1987)  which we read as requiring operational safety equipment  permitted officers to stop a vehicle that had any defective equipment, whether intended for safety or not. We reasoned that the State's interpretation would permit stops for malfunctioning air conditioners or defective radios, which was not a reasonable construction of the statutory language. Doctor, 596 So.2d at 447.
In State v. Riley, 638 So.2d 507 (Fla. 1995), the Court confronted a case involving a stop for failure to signal a turn. There, however, the dispute centered on whether the applicable statute actually made it illegal to turn without signaling where no other vehicles might be affected by the turn. Finding that the statute did not prohibit such a turn, we concluded that the stop in Riley was illegal.
It deserves emphasis that the stops in Doctor and Riley failed because they could not meet the first element of the review standard we have derived from Bates above. In other words, it did not matter whether the trial court below had found competent substantial evidence that these stops were a routine practice of similar officers, because the stops were inherently contrary to law. Even customary practices cannot transform an illegal act into a legal one.
The district courts are in general accord with the analysis outlined above. In Monroe v. State, 543 So.2d 298 (Fla. 5th DCA 1989), the Fifth District addressed a situation where an officer on narcotics patrol stopped the defendant because the latter's vehicle had a "bald tire." The stop occurred after the vehicle was seen circling repeatedly around an area known for high crime and drug trafficking. In rejecting the stop under the reasonable officer test, the Monroe court noted that the State had failed to carry its burden of demonstrating that "a reasonable officer on drug patrol would have made a traffic stop for a bald tire, absent another invalid purpose, under the facts and circumstances present here." Id. at 299. In sum, Monroe appears to be a case in which the State failed to meet its burden.
Florida courts have addressed a variety of other situations, all of which generally comport with the Eleventh Circuit's reasonable officer test. For example, one district court found an impermissible pretext where the officers actually had failed to cite the defendant for the minor traffic infraction in question and had followed the defendant's vehicle for five miles or more after the infraction occurred. Hills v. State, 629 So.2d 152, 154 n. 1 (Fla. 1st DCA 1993). Another found a pretext for an arrest prompted by the burning of trash, which without more was not a crime under the statute in question.[5] The district court noted that a serious fire might warrant a stop for exigent circumstances, but that the fire at issue did not rise to that level. Mims v. State, 581 So.2d 638, 640 (Fla. 5th DCA 1991).
We further note another policy reason underlying the reasonable officer test. Florida like most other jurisdictions has a variety of police agencies with differing and sometimes overlapping duties. For example, our law expressly recognizes the authority of Florida Agriculture & Consumer Services road guard inspection special officers to effect arrests in keeping with their duty to enforce agricultural and livestock laws. Florida Police Benevolent Ass'n, Inc. v. Dep't of Agriculture & Consumer Servs., 574 So.2d 120 (Fla. 1991) ("FPBA"). Our opinion in FPBA likewise recognized authority for these special officers to effect an arrest where an "agricultural stop" results in the discovery of contraband but no actual violation of agricultural or livestock laws. Id. at 122-23.
However, we specifically cautioned in FPBA:
We do not imply by our opinion today that road guard inspection special officers must assume the precise role and duties imposed upon other less specialized law *1046 enforcement officers, such as police or sheriff's deputies. Rather, we believe the legislature merely contemplated that some situations  such as the discovery of illicit drugs  may arise in which road guard inspection special officers will be the only law enforcement officers at the scene of a crime. They thus may serve as a stopgap until other law enforcement officers arrive.
Id. at 123. In other words, a stop is permissible if effected by specialized officers properly acting within the scope of their usual duties and practices even if they thereby discover a violation of completely unrelated laws and even if they find no actual violation of laws they are charged to enforce. Likewise, exigent circumstances  including the absence of other more generalized law officers where a serious crime is being committed  also may justify detention by such officers. However, road guard inspection special officers stopping a vehicle for a minor traffic violation  a matter falling outside their usual duties and practices  would place a heavy if not insurmountable burden on the State to demonstrate a lack of pretext.[6]
Turning to the facts at hand, we are constrained to review the record on appeal under the competent substantial evidence standard. In that vein, we begin by noting that Sergeant Deal clearly was legally authorized to make the stop in question. Section 316.610(1), Florida Statutes (1991), states:
Any police officer may at any time, upon reasonable cause to believe that a vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair, require the driver of the vehicle to stop and submit the vehicle to an inspection and such test with reference thereto as may be appropriate.
Section 316.2952(4), Florida Statutes (1991), states:
Every windshield wiper upon a motor vehicle shall be maintained in good working order.
Thus, there is no question that legal authority for the stop existed pursuant to a valid traffic safety statute, and that a traffic stop of this type fell within the usual duties of officers in Deal's department.
Likewise, the trial court below expressly found that the stop was not motivated by any pretext. Accordingly, the sole remaining question for a Florida appellate court to address is whether the record contains competent substantial evidence supporting the trial court's finding. The record is somewhat conflicting as to whether a stop of this kind is so unusual as to be considered a pretext. Sergeant Deal testified that he had made similar stops in the past, though he conceded that he remembered doing so when persons were driving in the rain with defective wipers.[7] Officer Arnold, on the other hand, testified that he had not stopped anyone for defective wipers in his two years on the force.[8]
Nevertheless, we agree with the observation of the Eleventh Circuit in Bates, 840 F.2d at 860, when it noted that an officer *1047 charged with enforcing traffic laws is entitled to a presumption that the "officer would obey this mandate." In sum, once the State has established that the traffic stop was legally authorized and that it fell within the usual duties assigned to similar officers, then any legitimate doubt whether the State has met its burden should be resolved in favor of the State.
The facts of the present case bear some similarity to those in Hills, in that Daniel was not charged with the infraction that initially resulted in the stop. However, the similarity ends there. For one thing, the stop here was immediate, whereas in Hills it was substantially delayed. For another, Sergeant Deal testified that he only intended to give Daniel a warning about his windshield wiper  a reasonable police action  and nothing in the record impugns this assertion. Moreover, Deal was entirely within his authority to ask Daniel for a driver's license after effecting the stop.
The dispositive fact here is that, when Daniel could not produce a driver's license, probable cause immediately arose to believe that he had violated a statute intended to protect the public from harm  the requirement of valid licensure. The initial stop was valid and objectively nonpretextual under the reasonable officer rule because it was only intended for issuing a warning. But once a probable violation of the licensure statute became apparent, the reasonable officer rule simply ceased to be a bar to further police action. A violation of the licensure statute cannot be deemed a minor infraction because of its obvious relation to public safety,[9] and officers therefore are independently justified in stopping and arresting for such a violation without regard to any pretextual motive they may have. Moreover, the record clearly shows that Daniel was arrested for the offense of driving without a license and only later, in routine booking procedures, did officers at the jail discover cocaine hidden on his person.
As noted above, the question is for the finder of fact where the record adequately supports both theories of the case. We believe the facts of the stop and the testimony of Sergeant Deal established at least competent substantial evidence supporting the trial court's finding, notwithstanding Officer Arnold's assertion he had made no similar stops. Our appellate courts have upheld stops even where the factual evidence establishing a lack of pretext came from the arresting officer. State v. Carter, 563 So.2d 728, 728 (Fla. 3d DCA 1990). Moreover, the present case clearly is distinguishable from Doctor and Riley because the stops in these two cases were illegal, whereas the stop here was authorized by law. Accordingly, we find competent substantial evidence supporting the trial court's determination.
Based on our analysis above, we must answer the certified question with a qualified affirmative. Our opinion in Kehoe remains good law until such time as the United States Supreme Court may overrule or modify it,[10] and we agree that Kehoe will require suppression in those instances identified by this opinion. Nevertheless, we disagree with the district court's assumption that the State here failed to establish that a reasonable officer would have effected the stop in question. The record contains competent substantial evidence supporting the trial court's finding on this point, which the district court erred in reversing.
The decision below is quashed. On remand Daniel's conviction shall be reinstated.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The United States Supreme Court to date has denied certiorari when the issue has been brought to it, though at least one Justice has noted the split of authority and urged the Court to resolve it. Cummins v. United States, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 449 (1991) (White, J., dissenting on denial of certiorari).
[2] The competent substantial evidence standard of appellate review also has been applied in this same context by Florida courts. E.g., Thomas v. State, 583 So.2d 336, 338 (Fla. 5th DCA 1991). As a general rule, any conflict on this question is for the finder of fact to resolve where the record contains competent substantial evidence as to both the State's and the defense's theories. On the other hand, a record containing uncontroverted and believable evidence supporting only a single theory means the trial court must accept that theory as fact, even if the theory is based entirely on the arresting officer's testimony. State v. Carter, 563 So.2d 728, 728 (Fla. 3d DCA 1990). Any other ruling is plain error.
[3] The opinions in Spann v. State, 512 So.2d 1106 (Fla. 5th DCA 1987), and Esteen v. State, 503 So.2d 356 (Fla. 5th DCA 1987), were disapproved sub silentio by Kehoe v. State, 521 So.2d 1094 (Fla. 1988). The Fifth District has so recognized. Monroe v. State, 543 So.2d 298, 299 (Fla. 5th DCA 1989).
[4] Though we disagree with the analysis used in People v. King, 34 Cal. App.4th 1576, 36 Cal. Rptr.2d 365 (1994), we agree with the result it reached based on the cumulative impact analysis. In King officers received a report of a motel robbery and soon thereafter observed a vehicle driving away from the vicinity of the motel with an expired registration. At least one of the occupants bore some similarity to the description of one of the robbers. While the California court focused solely on the expired registration to justify the stop under the objective test, we would have reached the same result on grounds that the detention was properly based on "cumulative impact" probable cause.
[5] Again, it is worth noting that the stop failed here because it was illegal, not because it was "unusual."
[6] The objective test in its broadest conception clearly fails to address the problems that sometimes will arise with specialized officers. For this additional reason we are not persuaded by its logic.
[7] The following colloquy occurred between defense counsel and Sergeant Deal:

Q. Have you ever pulled anybody over for having a windshield wiper across the windshield?
A. For having a windshield wiper across the windshield?
Q. Yes.
A. I don't know if I have pulled over for that. I have pulled over  you asked me that in deposition and when I answered I said the same thing. I can't give you any specific instances that I have. I have issued citations for faulty equipment when windshield wipers have not worked when it was raining.
Q. And it wasn't raining?
A. And for cracked windshield [sic] I have stopped people, but as far as for specifically a windshield wiper being stuck I don't know if I  you see that many anyway.
Q. It wasn't raining that day?
A. No, it was not.
[8] The following colloquy occurred between defense counsel and Arnold:

Q. And what was it then  again what was the reason that [Daniel] was pulled over?
A. For windshield wiper across the front.
Q. Have you ever pulled somebody over for having a windshield wiper over the windshield?
A. No, sir. I have not.
[9] In Florida, the lack of a valid license may indicate that the license has been revoked because of frequent offenses, driving under the influence, and similar matters.
[10] On Fourth Amendment issues, Florida law conforms to apposite precedent of the United States Supreme Court. Art. I, § 12, Fla. Const.; Perez v. State, 620 So.2d 1256 (Fla. 1993). Any Supreme Court pronouncement factually and legally on point with the present case would automatically modify the law of Florida to the extent of any inconsistency.