**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                   No. 95-5169

JUDITH VICTORIA MOLODET,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Frank W. Bullock, Jr., Chief District Judge.
(CR-94-211)

Argued: November 3, 1995

Decided: January 9, 1996

Before RUSSELL and HALL, Circuit Judges, and MICHAEL,
United States District Judge for the Western District of Virginia,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Anthony Wayne Harrison, Sr., HARRISON, NORTH,
COOKE & LANDRETH, Greensboro, North Carolina, for Appellant.
David Bernard Smith, Assistant United States Attorney/Senior Litiga-
tion Counsel, Greensboro, North Carolina, for Appellee. **ON BRIEF:**
Walter C. Holton, Jr., United States Attorney, Greensboro, North Car-
olina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Judith Victoria Molodet pled guilty to one count of possession with intent to distribute cocaine powder, on condition that she be permitted to appeal the district court's denial of her motion to suppress certain physical evidence seized by the police. Molodet also appeals her sentence. We conclude that the district court did not err by denying the motion to suppress, and that it accurately computed Molodet's sentence. Consequently, we affirm.

I.

Between September 4 and September 15, 1993, H. Wayne Austin, a vice and narcotics detective with the Greensboro, North Carolina, Police Department (GPD), received several telephone calls from an anonymous person. The caller informed Austin that he or she had learned from another that Molodet was selling large quantities of cocaine powder. The caller provided Molodet's physical description, her address, her roommate's name, and a description of her cars. The source said that Molodet would drive to Chapel Hill to pick up the cocaine, then return home to divide it up. After dividing the powder, Molodet would keep some to sell and take the rest to a commercial storage bin for safekeeping. According to the caller, Molodet kept the proceeds from her drug sales in a safety deposit box at an unnamed bank.

Austin began to investigate Molodet. He went to the address provided by the caller, and he noted that the vehicles parked in front matched the caller's description. The cars were registered to the person said to be Molodet's roommate, and both Molodet's and her roommate's driver's license listed the Greensboro address as her place of residence.

2

Over the next several days, Austin watched Molodet, but he never saw her drive to Chapel Hill or to a storage facility. On September 10, Austin encountered Detective Eddie Hoover, who had been assigned to the GPD's metro interdiction unit; Hoover happened to be at the vice and narcotics office that day, and Austin observed him at a computer terminal, entering Molodet's name into the database. Austin asked Hoover about Molodet, and Hoover replied that his office had just received an anonymous phone tip that Molodet was selling drugs, and that the contraband was being kept at a storage facility off Randleman Road in Greensboro.

On September 16, with Austin still following her, Molodet went to a storage facility, All-American Mini-Storage, which indeed turned out to be just off Randleman Road. Austin watched Molodet park in front of some storage bins and open the trunk of her car. His view was obstructed; thus, he could neither see her open a specific bin, nor transfer anything between a bin and the trunk. Austin walked into All-American's office to find out whether any of the bins had been leased to Molodet. Before the manager could tell him anything, Austin noticed that Molodet had gotten in her car and was leaving.

Austin left to follow Molodet. When she left All-American, Molodet continued to drive in the same direction in which she had been traveling when she arrived; she turned right at the first intersection, made a U-turn in a parking lot, then drove back past the storage facility and, shortly thereafter, onto I-85. Austin pulled her over and radioed for uniformed backup. He also requested the assistance of a female detective (Walters), a third detective (Graves) to return to All-American, and a K-9 unit to assist Graves.

The uniformed officer arrived almost immediately. Austin obtained Molodet's consent to search the car's passenger compartment, and, in Molodet's purse on the right front seat, discovered a little over $5,000 in currency and a box of plastic sandwich bags. He asked if he could search the trunk, and Molodet consented; Austin found nothing incriminating. Walters arrived as Austin was finishing his search, about fifteen minutes after the initial stop. Walters asked Molodet to consent to a search of her person; Molodet agreed, and voluntarily produced a small amount of cocaine powder that she had hidden in her sock.

Molodet was arrested, and the uniformed officer took her to the police station. Austin and Walters drove Molodet's vehicle and Austin's police car back to All-American, where they met Graves and the K-9 unit. Austin checked again with the manager, who informed him that no bin had been leased in either Molodet's name or that of her roommate. Austin then had the drug dog sniff the bins numbered 515 to 549, located in the area where Molodet had been parked; the dog alerted to Bin #529. The bin was secured with a Master padlock. Austin recalled that there were two padlock keys on Molodet's key ring; he retrieved the ring from the auto and tried the keys, but neither fit. Graves searched the glove compartment and found a third key; that key unlocked the padlock. Austin re-locked the bin and left to obtain a search warrant, which was promptly issued.

A gym bag and a styrofoam cooler inside the bin contained 152 grams of cocaine powder, lactose, a set of scales, assorted drug paraphernalia, and more than $36,000 in currency. Further investigation revealed that Molodet had a safety deposit box at a local bank. The detectives obtained a second warrant, searched the box, and found another $56,821; in all, approximately $98,000 was seized from Molodet, the storage bin, and the safety deposit box.[1]

Molodet was indicted; her lawyer moved to suppress all of the seized evidence. The district court, after a hearing, denied the motion. Faced with trial, Molodet agreed to plead guilty on the condition that she be allowed to appeal the district court's rulings on the issues raised at the suppression hearing.

II.

Molodet challenges Detective Austin's initial stop of her vehicle and the subsequent search of her person by Detective Walters. Because the initial stop, if improper, would taint everything that happened afterward,[2] we first examine Austin's actions.

_____

[1] Molodet and the government eventually agreed that $83,000 would be forfeited. The remaining $15,000 was distributed to Molodet's parents, who asserted that they had lent their daughter $25,000.

[2] **See United States v. Rusher**, 966 F.2d 868, 875 (4th Cir.) (if the initial stop is illegal or its proper scope is exceeded, contraband found during a subsequent search is excluded under the "fruit of the poisonous tree" doctrine), cert. denied, 113 S. Ct. 351 (1992).

A.

Under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, police officers may, upon acquiring a reasonable and articulable suspicion that a particular person is engaged in criminal activity, briefly detain that person in order to investigate. Whether a reasonable and articulable suspicion existed to justify a Terry stop is determined by examining the totality of the circumstances apparent to the detaining officers at the moment of the encounter. United States v. Cortez, 449 U.S. 411, 417 (1981).

An anonymous tip may suffice to establish a reasonable and articulable suspicion, depending on the content of the information and its indicia of reliability. Alabama v. White, 496 U.S. 325, 330 (1990). Both the quantity and the quality of the information are considered in evaluating the totality of the circumstances.[3] Id. Hence, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be if the tip were more reliable." Id. It follows, then, that a tip which is very likely reliable need not provide as much detailed information as one that is less amenable to verification.

Most of the information provided by Austin's informant was not so detailed as to evince a special familiarity with Molodet's affairs. See note 3, supra. A person knowing next to nothing about Molodet could have easily provided the police with her description, her address, the make and model of her automobile, and her roommate's name; that Austin's investigation confirmed the caller's account of these superficial facts was of little value to him in determining whether the information concerning Molodet's alleged drug dealing was likewise accurate. However, the informant also provided the important detail

_____

[3] The "quantity" of information refers to the tipster's ability to provide details, not only of "easily obtained facts and conditions existing at the time of the tip," but also of "future actions . . . ordinarily not easily predicted." See White, 496 U.S. at 332. The ability to predict future behavior demonstrates the informant's "special familiarity" with the suspect's affairs. Id. "Quality," on the other hand, refers to the extent that the police are able to ascertain independent facts tending to confirm the tip's accuracy. See id. at 330-32.

5

that Molodet had rented a commercial storage bin; to the extent that this detail could be verified, it would assist in demonstrating that the informant had a special familiarity with Molodet's affairs.

If the informant's tip were legitimate, Austin could (and probably did) anticipate that Molodet would visit a storage facility in the near future. Her trip to All-American provided Austin with verification of the most important detail of the informant's story. Molodet's actions lent the tip substance; in addition, because her behavior conformed to that essentially predicted by the informant, the tip's reliability was enhanced.

The strongest indication that the information was reliable, however, was that there were separate tips, given by different informants to different police officers.[4] Although we do not formally elevate the common wisdom that "where there's smoke, there's fire" to a tenet of Fourth Amendment jurisprudence, we are confident that, under <u>White</u>, the strong indicia of reliability imparted to Austin's tip by his knowledge of a subsequent, separate tip adequately compensates for any dearth of detail in the former. We thus conclude that Austin's initial stop of Molodet was supported by a reasonable and articulable suspicion of criminal activity.

_____

**4** The district court noted Molodet's argument that there was no direct evidence that different persons had phoned Austin and Hoover; the court nevertheless found that the circumstantial evidence indicated that the tips were distinct:

> That is not absolutely clear, you're right. [However,] [i]t seems unusual that the tipster would call Austin, have four or five conversations with Austin, give the source of his information, never mention the location of the warehouse, and that same tipster for some reason four or five days later would make another call to another location to someone and give the location of the warehouse. But it is possible, I agree.

In denying the suppression motion, the court relied on its finding that the police had received two tips, stating that "I put a lot of weight to the fact that [Hoover received] what would appear to be a different call. . . ."

6

B.

After Austin stopped Molodet, his search of Molodet's vehicle did not detain her for an unreasonably long time. Although Molodet admits that she consented to the search of her person, she maintains that, once Austin failed to find anything in the trunk of her vehicle, he should have told her that she was free to go. Detective Walters was already on the scene, however, and there was no reason why she could not have asked Molodet to consent to being searched. Indeed, considering the large amount of cash and the plastic bags that Austin had found in her purse, it would have been surprising had Walters not made such a request.

III.

At sentencing, the district court accepted the probation officer's recommendation that the $83,000 in forfeited funds, see note 1, supra, be considered the equivalent of 830 grams of cocaine powder, and that the converted amount be added to the 152 grams actually seized to arrive at the total drug weight attributable to Molodet. The court determined Molodet's base offense level to be 26, from which it subtracted three levels for acceptance of responsibility. See USSG §3E1.1. The resultant sentencing range, in light of Molodet's lack of a criminal history, was 46-57 months. The district court sentenced Molodet to 48 months' imprisonment and fined her $10,000.

In setting the offense level for sentencing, seized currency may be treated as its drug equivalent if the defendant obtained the money as part of the same course of conduct giving rise to the offense of conviction. United States v. Hicks, 948 F.2d 877, 882-83 (4th Cir. 1991). Even discounting the currency seized from the safety deposit box, the $36,000 seized from the storage bin was enough, when converted to its equivalent drug quantity, to establish the offense level under which Molodet was sentenced.[5] It was not clearly erroneous for the district court to find as a fact that the money stored in the bin was obtained

_____

[5] The 360-gram cash equivalent, in combination with the 152 grams seized, would have provided a sentencing total of 512 grams. Base Offense Level 26 includes any amount of powdered cocaine totalling at least 500 grams, but less than 2 kilograms. USSG§ 2D1.1(c)(7).

7

as part of the same course of conduct giving rise to the instant offense -- possession of cocaine powder with intent to distribute.

IV.

Molodet's conviction and sentence are affirmed.

<u>AFFIRMED</u>

8