**UNITED STATES of America**

v.

**Maurice McCRAY, Defendant**

**No. CRIM.02–47–P–H.**

United States District Court, D. Maine.

Sept. 26, 2002.

Thomas A. Dyhrberg, South Portland, ME, for Maurice McCray (1), defendant.

Jonathan R. Chapman, Office of the U.S. Attorney, Portland, ME, for U.S. Attorneys.

## ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on August 23, 2002, with copies to counsel, his Recommended Decision on Motion to Suppress. The time within which to file objections expired on September 12, 2002, and no objections have been filed. The Magistrate Judge notified the parties that failure to object would waive their right to *de novo* review and appeal.

It is therefore **ORDERED** that the Recommended Decision of the Magistrate Judge is hereby **ADOPTED**. The motion to suppress is **DENIED**.

**So ORDERED.**

### *RECOMMENDED DECISION ON MOTION TO SUPPRESS*

DAVID M. COHEN, United States Magistrate Judge.

Maurice McCray, charged with possession of, with intent to distribute, five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1), seeks to suppress evidence seized in a roadside war-

rantless search of a Chrysler PT Cruiser and its occupants in Scarborough, Maine on January 9, 2002. Superseding Indictment (Docket No. 3); Motion To Suppress, etc. ("Motion") (Docket No. 10).[1] An evidentiary hearing was held before me on August 20, 2002 at which the defendant appeared with counsel. Oral argument immediately followed the hearing. Based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the motion to suppress be denied.

### I. Proposed Findings of Fact

Maine State Police ("MSP") trooper Anthony Keim was patrolling the Maine Turnpike ("Turnpike") in the vicinity of Portland in an unmarked Crown Victoria on the morning of January 9, 2002 when he received word from his dispatcher to be on the lookout for a blue PT Cruiser with Vermont license plates, occupied by two black males, headed north on the Turnpike. The dispatcher relayed the report of Maine Drug Enforcement Agency ("MDEA") agent William Deetjen that the PT Cruiser's occupants were believed to be transporting drugs to the Waterville area. However, the dispatcher warned that the MDEA had not developed sufficient information to seek a warrant; accordingly, Keim could stop and search the

car and its occupants only to the extent he found probable cause to do so.

Shortly thereafter, at about 11 a.m., Keim spotted a blue PT Cruiser with Vermont license plates pulled over on the shoulder of the Turnpike northbound near mile marker 39 in Scarborough. The hood was up, and a black male was standing outside apparently flagging for help. Keim pulled his car behind the PT Cruiser. The man standing outside the car, whom Keim identified in court as McCray, approached Keim, and the two began to discuss his car troubles. Keim observed a second black male, later identified as Steven Peter Forde, sitting in the front passenger seat of the PT Cruiser. Keim recorded the encounter with the aid of a video camera mounted on his windshield and a wireless microphone worn on his person.[2]

Keim asked McCray for identification and inquired whether the PT Cruiser was his car. *See* Trooper Keim's Patrol Vehicle Tape, 1/9/2002 Mile 39.2 NB ("Keim Transcript"), Gov't Exh. 1T, at 2. McCray stated that his girlfriend had rented the car for him in Waterville so that he could make a trip to New Hampshire. *See id.* at 2–3. He said his passenger also was from Waterville and lived with him. *See id.* at 3.[3] McCray produced a photo identification

---

1. At oral argument held August 20, 2002 counsel for the government represented that the evidence sought to be introduced against McCray is cocaine base, or "crack cocaine," found in the coat pocket of a passenger in the PT Cruiser. Neither he nor defense counsel identified any other evidence (physical or statements) as in issue.

2. The Keim videotape, marked as Government's Exhibit 1, was admitted into evidence without objection. As Keim explained, there are gaps in the audio portion of the recording caused by the presence of a steel plate in his body armor that occasionally cut off transmission from his wireless microphone to the recording device. A transcript of the audio

portion of the tape, marked as Government's Exhibit 1T, was admitted at hearing subject to review by defense counsel for accuracy. By letter dated August 21, 2002 counsel for the government represented that he and defense counsel had conferred and agreed to substitute a revised page 14 in the Keim transcript. *See* Letter dated August 21, 2002 from Jonathan R. Chapman to William S. Brownell, Clerk ("Chapman Letter"). With that revision, Government's Exhibit 1T is now unconditionally admitted.

3. Later during the encounter Keim asked McCray his passenger's name. *See* Keim Transcript at 17. McCray said it was "Mark Smith." *See id.* Still later, when Keim again

card, rather than a driver's license, and showed Keim no car-rental papers.[4] Keim conducted a pat-down search of McCray, finding nothing of interest, then directed him to sit in the Crown Victoria.[5] At about that time, Keim was joined by MSP trooper Edmund Furtado, who also had been apprised of MDEA's suspicions concerning the PT Cruiser and its occupants and likewise had been warned to proceed on his own probable-cause determinations. Furtado, who pulled his cruiser behind the Crown Victoria, recorded the encounter via camera and wireless microphone in the same manner as did Keim.[6]

After Keim briefed Furtado, the latter turned his attention to Forde while Keim got into the Crown Victoria to resume questioning McCray. Keim asked whether McCray had been the driver of the vehicle; McCray confirmed that he had been. *See id.* at 13. Keim asked MSP dispatch to run a vehicle-registration check on the PT Cruiser and a check on McCray. The check revealed that the PT Cruiser was indeed a rental and that McCray's driver's license was under suspension, apparently for failure to pay a reinstatement fee.

While this was transpiring, Furtado approached the disabled PT Cruiser and motioned for Forde to roll down the window. Forde instead opened the door. Furtado asked Forde to step outside and unzip his coat—a bulky black winter coat—so that he could observe his waistband and the inside of the coat. Forde complied. Forde stated that he and his companion (whom Forde said had rented the PT Cruiser) had just been shopping at Timberland in Freeport, Maine. *See* Trooper Furtado's Patrol Vehicle Tape, 1/9/2002 Mile 39 NB ("Furtado Transcript"), Gov't Exh. 2T, at 2–3, 5. He told Furtado that he had no identification and no driver's license, whereupon Furtado asked him to write out his name, address and birth date. *See id.* at 4. Forde gave his name as "Michael Peter Smith," writing on a three-day-old Timberland receipt he had pulled out of his pocket.

While Furtado was questioning Forde, a third MSP trooper, Jean Poirier, arrived on the scene and walked to the PT Cruiser. After peering into the car through the open door, Poirier pointed down and told Furtado he had seen what appeared to be marijuana "in plain view" on an inside passenger door shelf and a "blunt"—a hollowed-out cigar used to smoke marijuana—on the floor near the front passenger seat. Furtado looked and saw what also appeared to him to be small pieces of marijuana (a greenish-brown substance), a blunt and tobacco (a brown substance) from the cigar.

Furtado, who had been involved in observing, handling and seizing marijuana on several hundred occasions during his fourteen-year tenure as an MSP trooper, believed further search would yield discovery

asked the passenger's name, McCray said it was "Steven" but that he did not know his last name. *See id.* at 22.

4. On cross-examination, Keim admitted that he never asked McCray to produce those papers.

5. Keim testified that he had McCray get into the Crown Victoria because it was so cold outside, and that he customarily does a pat-down search for safety reasons before putting anyone in his police cruiser.

6. The Furtado videotape, marked as Government's Exhibit 2, was admitted into evidence without objection. The Furtado videotape, like the Keim videotape, contains sound gaps. A transcript of the audio portion of the Furtado videotape, marked as Government's Exhibit 2T, was admitted at hearing subject to review by defense counsel for accuracy. Counsel for both the government and the defense subsequently conferred and agreed that Government's Exhibit 2T could be unconditionally admitted. *See* Chapman Letter. Accordingly, it is now so admitted.

of additional amounts of marijuana. In Furtado's experience, when a small amount of marijuana is seen in plain view, oftentimes much larger amounts ultimately are recovered. Furtado told Forde he was going to search his person and the interior of the PT Cruiser. He asked Forde to remove his coat, which Forde did, and directed him to the front of the vehicle. Poirier searched Forde's person while Furtado walked to the Crown Victoria with Forde's coat.

Furtado filled Keim in on his and Poirier's findings. *See* Keim Transcript at 13. Keim directed McCray to exit the Crown Victoria and placed him under arrest for operating after suspension ("OAS"). Furtado placed Forde's coat on the trunk of the Crown Victoria and searched it, discovering a fast-food bag in one of the pockets. He looked inside and found several bunched-up napkins. Inside those napkins were several large chunks (two to three inches in size) and smaller fragments of what Furtado believed to be crack cocaine. Forde was placed under arrest and charged with trafficking in cocaine base, a Schedule W drug, in violation of Maine law. McCray commented to Keim, "I don't have nothing to do with him [Forde] having that (unintelligible), man. I'm telling you I don't." *See id.* at 22.

## II. Discussion

In both his brief and at oral argument, counsel for the government contended that McCray lacks standing to press a Fourth Amendment challenge to the seizure of crack cocaine from Forde's person or clothing, and that this is fatal to his motion to suppress. *See* Government's Objection to Defendant's Motion To Suppress, etc. ("Response") (Docket No. 13) at 3–4. I agree.

As the First Circuit has explained:

The Fourth Amendment's protection against unreasonable searches and seizures extends only to those places and interests in which the defendant has a reasonable expectation of privacy. Such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis. What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. Essentially, ... to prove a Fourth Amendment violation, [a defendant] must demonstrate not only that he exhibited a subjective expectation of privacy, but also that his expectation was justifiable under the attendant circumstances. The defendant bears the burden of persuasion on this issue.

*United States v. Lewis,* 40 F.3d 1325, 1333 (1st Cir.1994) (citations, footnote and internal quotation marks omitted).

At oral argument, defense counsel took the position that inasmuch as McCray was authorized by his girlfriend to use the PT Cruiser, he harbored a legitimate expectation of privacy in the car and its contents, including its occupants. For this proposition he cited *United States v. Rusher,* 966 F.2d 868 (4th Cir.1992), in which the Fourth Circuit held that one defendant, Flannery, "did have a reasonable expectation of privacy in [a] truck and its contents. Although Flannery was not the owner of the truck, he was its driver and there is no evidence in the record tending to show that he was illegitimately in possession of it," *id.* at 874. However, Flannery challenged a "search of the truck" leading to discovery of drugs and firearms concealed in the truck bed, *id.* at 872–73, not an earlier search of a passenger's purse that also yielded a small quantity of drugs, *id.* at 872. When a second passenger (the first passenger's husband) did press a challenge to the evidence seized from his

wife's purse, the court held that he had failed to demonstrate a legitimate expectation of privacy in the purse. *Id.* at 875.

To the extent McCray argues that he possessed a legitimate expectation of privacy in Forde's person, he falls well short of making a persuasive case. Caselaw from this and other circuits casts doubt on whether there is any set of circumstances under which, for purposes of a Fourth Amendment challenge, a defendant can validly claim a privacy interest in another's person. *See, e.g., United States v. Sowers,* 136 F.3d 24, 28–29 (1st Cir.1998) (defendant who was not himself subject to pat-down search, which is properly viewed as search of person and not of clothing, cannot bottom Fourth Amendment challenge on that search); *United States v. Brown,* 743 F.2d 1505, 1507 (11th Cir.1984) (observing, in holding that defendant lacked standing to challenge seizure of drugs strapped to coconspirator's leg, "Unlike a house, a hotel room, an automobile or a briefcase, one cannot acquire a right to exclude others from access to a third person."). Whatever the outer boundaries of such a privacy claim, the circumstances of this case (in which the claim rests on mere status as the driver of a rental car) do not come close to testing them.

Nor is any claim of standing predicated on a privacy interest in Forde's coat or coat pockets ultimately persuasive on the facts of this case. Defense counsel does not cite, nor can I find, any case holding that mere status as a driver (or, for that matter, vehicle owner) imparts a reasonable expectation of privacy in clothing worn by passengers in a car. Inasmuch as appears, something more must be shown. McCray, who tried to distance himself from Forde by giving a false name for his companion and disclaiming any connection to the crack cocaine found in the coat, does not show that something more. *See, e.g., United States v. Medina–Verdugo,* 637 F.2d 649, 652 (9th Cir.1980) (defendant had no legitimate expectation of privacy in companion's purse inasmuch as he had no right to exclude others from opening it and did not take reasonable precautions to maintain its privacy, to the contrary asking companion to hold drug-sale proceeds precisely so that he could disclaim ownership of them); *compare, e.g., Rusher,* 966 F.2d at 874 (noting that, in addition to harboring a privacy interest in truck and its contents, "Flannery later claimed to own the drugs and firearms that were seized from the truck, and an ownership or possessory interest in seized goods, while not dispositive, is relevant to determining whether an accused has a reasonable expectation of privacy.").

Inasmuch as McCray fails to demonstrate, as a threshold matter, that he harbored a legitimate expectation of privacy in Forde's person or coat, I do not reach the government's second-tier arguments that the search was in any event (i) supported by probable cause as a result of discovery of the alleged marijuana and blunt "in plain view" or (ii) properly undertaken incident to McCray's arrest for OAS. *See* Response at 4–5.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memoran-*

*dum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

August 23, 2002.